BROWN, J., did not sit.
Action to compel defendant company to restore telephone connection of plaintiff company with the local exchange of defendant company in Dunn, N.C. and supply service in that town for plaintiff and subscribers, pursuant to a contract set forth and described in (12) the complaint. The cause was heard on a rule to show cause, obtained in term and returnable before Peebles, J., holding the courts of the Sixth District, at Wilmington, N.C. on 3 June, 1911, and on affidavits and proofs offered it was adjudged that, on plaintiff's entering into a justified bond in the sum of $1,000, conditioned to pay all costs and damages arising by reason of the order, in case same should be set aside, that the connection be restored as prayed for and the services rendered free of charge to plaintiff and its subscribers, *Page 10 
according to the terms of the contract referred to. Both parties having consented that the hearing could be continued and issue determined outside of Wilmington, the judgment was signed and entered at Beaufort, N.C. on 5 July, 1911, and defendant, having duly excepted, appealed to Supreme Court.
after stating the case: On the hearing it was made to appear that, in 1901, E. F. Young and wife owned and operated, for charge, a local telephone system in the town of Dunn, N.C. and plaintiff, a corporation acting under a quasi- public franchise, owned and operated a like system in the town of Clinton, N.C. and was extending its line towards Dunn. That on 15 February of that year the said Young and wife entered into a contract with plaintiff, in consideration of $10 and that plaintiff company would pay for two-thirds of the poles from the corporate line of Dunn to the local exchange in the town and of mutual stipulations in the agreement whereby the said plaintiff company could physically connect its system with the local exchange in Dunn and the patrons of the Dunn system, for a single charge of 25 cents, could send messages to Clinton and have service for local delivery, in that town, without further charge, and plaintiff and its subscribers should have like privilege and service in reference to local delivery in Dunn. The agreement stipulated further: "That the parties shall quietly enjoy the same and that this contract shall remain in full force and effect from and after the signing and sealing of (13) the same, and the successors and assigns of each shall forever quietly enjoy the privileges granted by the contract; that the toll fees of each shall be 25 cents from exchange to exchange and that local messages shall be settled and established by each so that the fees charged shall not exceed 25 cents. . . . That this contract shall not be revoked or changed without the consent and the same mutually agreed to by each, their successors and assigns. In testimony whereof," etc. That the physical connection was then made, the parties entered into the enjoyment and exercise of the privileges conferred by the contract and continued therein until October, 1901, when Young and wife sold and conveyed their system and all rights, etc., held by them to defendant company, a corporation acting also under a quasi- public franchise and owning and operating an extended system of telephone lines in the eastern part of the State; that the purchaser entered into the exercise of the rights conferred by the contract with plaintiff, and physical connection being continued, and stipulated service afforded by each until February, *Page 11 
1910, when defendant, having as stated, acquired the plants of various companies in the eastern part of the State and claiming to have spent large sums of money in improving these lines, giving them better equipment and affording a higher order of service, wrote plaintiff company, saying that the contract was not considered as binding on defendant; that it had not been made by the company; that it was unfair in its obligations and burdens and discriminative in its terms and operation. The letter stated, further, that the rights conferred had been abused on the part of plaintiff company, by extending the privileges granted to other lines and systems not included in the agreement, and contained formal notice that, unless within thirty days plaintiff entered into a contract agreeing to pay $72 per annum for service in Dunn to plaintiff and its subscribers and $72 additional per annum for each additional system exercising the priveleges [privileges] of the contract, and by plaintiff's permit or procurement, the connection with plaintiff company would be discontinued. That this demand not having been complied with, defendant severed the connection with plaintiff's system, depriving plaintiff and its subscribers and patrons of all service and telephone connection with Dunn and its inhabitants or any possibility of (14) procuring the same except on defendant's terms.
On these, the facts chiefly relevant to the inquiry, we think the court below correctly ruled that plaintiff was entitled to have the connection restored and service afforded, but that the order should be modified or so interpreted that the rate at which this service shall be rendered must be made to depend upon further findings of fact to be had and made in the cause.
It is very generally recognized that a telephone company, acting under aquasi- public franchise, is properly classified among the public-service corporations, and as such is subject to public regulation and reasonable control and is required to afford its service at uniform and reasonable rates and without discrimination among its subscribers and patrons for like service under the same or substantially similar conditions. Godwin v.Telephone Co., 136 N.C. 258; Leavell v. Telegraph Co., 116 N.C. 211;Horner v. Electric Co., 153 N.C. 535; Griffin v. Water Co., 122 N.C. 206;Telegraph Co. v. Telegraph Co., 61 Vt. 241; Telephone Co v. TelegraphCo., 66 Md. 399; Yancey v. Telephone Co., 81 Ark. 486; Telegraph Co. v.Kelly, 160 Fed., 316.
In the absence of constitutional or statutory requirement, this obligation to afford service at reasonable rates and without discrimination to all who will "pay the charges and abide by the reasonable regulations of the company" does not as a rule extend to making physical connection with the company's lines, but there is high authority for the position that, when such physical connection has been voluntarily made, *Page 12 
under a fair and workable arrangement and guaranteed by contract, and the continuous line has come to be patronized and established as a great public convenience, such connection shall not, in breach of the agreement, be severed by one of the parties. In that case the public is held to have such an interest in the arrangement that its rights must receive due consideration. This position finds approval in S. v.Cadwallader, 172 Ind., 619-636 and is stated in the elaborate and learned opinion of Chief Justice Myers as follows: "Such physical connection cannot be required as of right, but if such connection is (15) voluntarily made by contract, as is here alleged to be the case, so that the public acquires an interest in its continuance, the act of the parties in making such connection is equivalent to a declaration of a purpose to waive the primary right of independence, and it imposes upon the property such a public status that it may not be disregarded," citing Mahanv. Telephone Co., 132 Mich. 242; and the reasons upon which it is in part made to rest are referred to in the same opinion as follows: "Where private property is by the consent of the owner invested with a public interest or privilege for the benefit of the public, the owner can no longer deal with it as private property only, but must hold it subject to the rights of the public in the exercise of that public interest or privilege conferred for their benefit." Allnut v. Inglis (1810), 12 East, 527. The doctrine of this early case is the acknowledged law. It is stated somewhat differently inMunn v. Ill (1876), 94 U.S. 113, 24 L.Ed., 77, where it is said: "Property does become clothed with a public interest when used in a manner to make it of public consequence and affects the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but so long as he maintains the use he must submit to the control." See, also, Telephone Co. v. Telephone Co., 118 Ky. 277; 37 Cyc., pp. 1621-1658.
While we hold, therefore, that the physical connection of these lines should be continued, it does not necessarily follow that the service shall be rendered at the rate originally fixed upon. So far as these parties are individually concerned, these original rates should bind. It is true that defendant company was not one of the original contracting parties, but the contract provides that it shall extend to the successors and assigns of each, and defendant company, with full knowledge of its existence or of facts that should have put it upon inquiry leading to knowledge, took over the property, entered on the enjoyment of the rights (16) and privileges conferred, and may not be allowed as individuals *Page 13 
to repudiate its obligations and its burdens. Mahan v. Telephone Co.,132 Mich. 242. But here, too, the rights of the public must, on authority and principle, be allowed to affect the question. As heretofore stated, these public-service corporations are required to render their service at uniform and reasonable rates and without discrimination, and they are not allowed to enter on or continue in the performance of a contract which discriminates among their patrons or which renders them unable to afford the same or perform the duties imposed upon them by reason of their charter. Griffin v. Water Co., supra; Gibbs v. Gas Co., 130 U.S. 396;Western Union v. American Union, 65 Ga. 160; Thompson on Corporations, sec. 2792, and authorities cited.
In the case of Gibbs v. Gas Co., the position is stated as follows: "Courts decline to enforce contracts which impose a restraint, though only partial, upon business of such character that restraint to any extent will be prejudicial to the public interest. But where the public welfare is not involved and the restraint upon one party is not greater than protection to the other party requires, a contract in restraint of trade may be sustained. A corporation cannot disable itself by contract from the performance of public duties which it has undertaken, and thereby make public accommodation or convenience subservient to it private interests."
And applying the principle, if, under conditions developed in the reasonable and orderly exercise and performance of defendant's duties, under its charter, the rates agreed upon between these contracting parties are of a character that discriminate among defendant's patrons receiving like service under like conditions, or it is so unreasonable and burdensome as to render defendant company unable to perform properly the duties incumbent under its charter, the agreement, to that extent, must be annulled and the parties allowed to continue the service under such reasonable rates as they may further agree upon, or which may be sanctioned and approved by the supervising agencies established by law for the purpose. Revisal, 1905, sec. 1986 et seq.
In regard to the form of remedy available where, as in this (17) State, the same court is vested with both legal and equitable jurisdiction, there is very little difference in its practical results between proceedings in mandamus and by mandatory injunction, the former being permissible when the action is to enforce performance of duties existent for the benefit of the public, and the latter being confined usually to causes of an equitable nature and in the enforcement of rights which solely concern individuals. High on Injunctions (4 Ed.), sec. 2. Owing to the public interests involved, in controversies of this character, it is generally held that mandamus may be properly *Page 14 
resorted to. Godwin v. Telephone Co., supra; Commercial Union v. TelephoneCo., supra; Mahan v. Telephone Co., 132 Md. 242; Yancey v. Telephone Co.,81 Ark. 486.
We are not inadvertent to Solomon v. Sewerage Co., 142 N.C. 439. This was a case in which the rights of individual litigants were alone involved and where, in a well-considered opinion by Associate JusticeConnor, specific performance of the contract, at a specified rate, was refused, on the ground that the contract in question was indefinite as to time, and in that respect also, was unilateral in its obligation. The rights growing out of the contract as affected by the public interests was referred to, but not considered or determined. The order, directing that physical connection with defendant's exchange be restored and service continued, is affirmed, and the cause is remanded for further findings of facts and determination thereon by the court; whether the contract, at the stipulated rate, is discriminative among patrons receiving like service under like conditions or whether it is so unfair and burdensome as to render defendant company unable to perform properly the duties incumbent under its character to afford the general public telephone service at uniform and reasonable rates, an issue to be decided on conditions affecting the public interests, for, if these interests may be properly conserved, the fact that, as between the individuals concerned, the contract rate may operate unequally, would not justify or permit that the contract in that respect be avoided. It will be also ascertained and determined whether plaintiff has extended the privileges conferred by the contract to persons or telephone (18) systems not embraced within the agreement. The judgment will be modified, in accordance with this opinion, and is otherwise affirmed.
Modified and affirmed.
BROWN, J., did not sit.
Cited: Woodley v. Telephone Co., 163 N.C. 286.