NORTH CAROLINA PUBLIC SERVICE COMPANY AND SALISBURY AND SPENCER RAILWAY COMPANY v. SOUTHERN POWER COMPANY.

(Filed 20 December, 1919.)

1. **Pleadings—Demurrer.**

   A *demurrer ore tenus*, after answer filed, admits the allegations of the complaint, and if any part thereof is sufficient, construing liberally every reasonable intendment or presumption in favor of the pleader, the pleading will be sustained.

2. **Monopoly—Discrimination—Corporations—Public Service—Electricity —Hydroelectric—Courts—Jurisdiction.**

   Where a public-service corporation has acquired, under a long-term contract with another company, the control over a large territory of the exclusive right to furnish hydroelectric power and light to municipalities, and to other public-service corporations, for distribution or retail to the consumers, including subsidiary companies that it owns or controls, it may not discriminate among its patrons under the same or substantially similar conditions as to the rate charged, or select its own customers, but the same, being affected with a public use, is subject to the control and jurisdiction of our courts.

3. **Courts—Jurisdiction—Corporations—Public Service—Charter Powers —Other Public-Service Corporations — Electricity — Hydroelectric Companies.**

   Where a public-service corporation engages in a class of business authorized by its charter, it dedicates its property to that particular class of use, and where a hydroelectric company having a monopoly has been authorized by its charter to sell to other electric companies, etc., power, etc., for retail or distribution among customers, it may not resist the jurisdiction of our courts upon the ground that they were not legally required to do so, though the distributing or retail company is in some sense a competitor, and has the charter right to generate or manufacture its own electricity.

**4. Mandamus—Corporations—Public Utilities—Discrimination—Rates—Courts.**

Where a public-service corporation has discriminated among its patrons in its charges for the same or similar service, a mandamus will lie to compel it to charge a uniform or undiscriminating rate; for the question does not require the courts to fix a rate, or pass upon its reasonableness, the lowest rate charged becoming, automatically, the proper one.

**5. Monopolies—Hydroelectric Corporations—Public Utilities—Electricity Rates— Discrimination— Subsidiary Companies — Earnings — Mandamus.**

Where .the owners of a public utilities corporation, for the generation of hydroelectric power, sell it to another company that they own or control, issue bonds for the purchase price to its full value, and issue additional stock to themselves, then enter into a long-term contract to supply the vendor company with hydroelectric power at a low rate, and have subsidiary companies which they supply at a certain rate, for retail or distribution among consumers, as also certain municipalities, within the territory under its control, it is required to supply such power to other public utility companies at the same and not a discriminatory rate, without reference to the rate such other company charges the consumers it supplies; and objection that the company is required to pay the interest on its bonds, running expenses, etc., out of its profits will not be considered when it appears, by demurrer, that the net earnings were more than sufficient.

BROWN, J., concurring; ALLEN, J., dissenting; WALKER, J., concurring in the dissenting opinion.

APPEAL by defendant from *Shaw, J.,* at chambers, 15 October, 1918, from GUILFORD.

This was a *mandamus* against the Southern Power Company to compel it to continue to furnish electric current from its substation at Salisbury to the plaintiffs for the use and benefit of Salisbury, Spencer, and East Spencer, and the inhabitants thereof, and for operation of the electric street car system, as theretofore furnished, and to compel said Southern Power Company to furnish such service, power, and current, and without discrimination in favor of others for like service, under the same or substantially similar conditions. The Southern Power Company answered, and in addition demurred *ore tenus* to the complaint, alleging:

1. That the court has no jurisdiction to compel it to furnish electric current and power from its substation at Salisbury to the plaintiff for the purpose set forth in the .complaint; and

2. That the court has no power or jurisdiction to require the defendant to furnish power at a uniform rate without discrimination against the plaintiffs.

The court held that it had jurisdiction to pass upon and determine the matters set out in the complaint, and that the complaint states a good cause of action.

The complaint avers that the plaintiff, Salisbury & Spencer Railroad Company, is a public-service corporation under the laws of this State, which operates a street railway, electric light, and gas plant in Salisbury, Spencer, and East Spencer, its franchise rights being granted by those cities to operate the street railway by electricity and to furnish electric current for the public lighting of said cities, and to the inhabitants of the same for domestic and power purposes. On 11 January, 1912, it leased all of its rights and property to its coplaintiff, the North Carolina Public Service Company, for a period of fifty years. The latter company is a public-service corporation, chartered under the laws of this State, with its principal offices in Greensboro, and it owns a large part of the capital stock of the Spencer & Salisbury Railroad Company, and has for many years past, and still does control and manage the same through the 50-year lease, including the purchase of electric power from the defendant, and its distribution to said city for domestic and industrial use as well as the public lighting for the streets of the three said cities, and it also owns and operates similar properties in Greensboro, High Point, and Concord, N. C.

The defendant power company is a public-service corporation, chartered in New Jersey, and doing business in this State, with its principal office in Charlotte. It is engaged directly and indirectly in the business of generating hydroelectric power by means of dams built across large streams of water, which, by suitable machinery, is converted into electric power and conveyed over large wires by heavy voltage in great quantities to "receiving substations." At these stations large transformers are installed by the defendant company, by which the current thus received is "stepped down"—that is, reduced from 100,000 voltage to as low as 2,300 volts, and after being so reduced the power is sold and distributed to various and sundry consumers connected with these substations. At each of these substations the agent of the defendant company keeps a record, by means of separate meters, of the amount of electric power furnished each consumer. The defendant has built transmission lines to various points in western and piedmont North Carolina: Gastonia, Concord, Salisbury, Spencer, Statesville, Winston-Salem, High Point, Greensboro, Burlington, Graham, Hillsboro, Durham, Spray, and Reidsville, and to many cotton mills and other industrial plants along or near its lines connecting these various cities and localities, and at each of the above places, it maintains and operates various substations, as above described.

The defendant power company is a public-service corporation, and only by reason thereof enjoys the right of eminent domain under which it has been enabled to construct and operate these lines, and the said company is the only hydroelectric company whose transmission line extends to the points above named, including the towns of Salisbury,

Spencer, and East Spencer. It enjoys, therefore, a monopoly of this business, and also by long service its business is "affected with a public use," and it is therefore subject to public control and regulation not only in fixing and prescribing its rates, but more especially in the requirement that it shall furnish its facilities at the same rate to all receiving them under like conditions. The plaintiff, the North Carolina Public Service Corporation, prior to the time the defendant's transmission line was completed at Salisbury, generated its own electric current and power by a local steam plant, but about ten years ago the defendant approached the plaintiffs, assuring them that it would furnish power at less cost than it could be produced by steam generated from coal, and on this assurance the plaintiff and a large number of mills, factories, and other industrial plants were induced to discontinue their steam plants and made contracts with the defendant for their necessary electric current and power. Thereby the defendant acquired a complete monopoly of the hydroelectric power market at Salisbury and Spencer. The contract between the plaintiffs and the defendant was for ten years, and expired August, 1918. Under that contract the defendant charged the plaintiffs a rate of 11 mills per Kw. H. Some months prior to the expiration of this contract the defendant proposed to the plaintiff Public Service Company to make a new contract for the same service for another ten years at a substantial increase in rates. The defendant refused to contract for a period of less than 5 years, and persisted in demanding an increase in rates, and sent its agent to the home office of the plaintiff, North Carolina Public Service Company, in Greensboro, and demanded that the contract which it then presented should be signed within 48 hours. The rate stipulated in said contract was greatly in excess of the former rate, being increased to 15 mills per Kw. H., and was based upon the then war price of coal, according to the statement of defendant's agent.

*The plaintiff especially objected to this increase of increased rate on the ground that it was beyond the rate charged by the defendant to other companies for like service under the same or substantially similar conditions, and the plaintiff declined to sign said contract.*

The defendant power company, after the expiration of the ten-year contract, rendered the public service company bills for current and power at the rate of 18 mills per Kw. H., and notified the plaintiff that if this rate was not paid it would discontinue supplying current to the plaintiff at Salisbury. The president of the defendant power company is J. B. Duke, who is the principal owner thereof, and controls its policy and management. He is also largely interested financially in various cotton mills in North and South Carolina, and in street power and street railway and electric lighting also, some of which mills and plants are located in Charlotte, Gastonia, Concord, and Durham, and all are fur-

nished light and power through the current received from the defendant power company, which has been and is selling current to those mills at a maximum rate of 11 mills per Kw. H., and in some instances to be used for power and lighting the mills and villages and other plants in which the defendant's principal owner is interested, and in some instances at a lower rate, greatly less than is charged and proposed to be charged the plaintiffs under substantially similar conditions; the said J. B. Duke is also the principal owner, either directly or indirectly, through his immediate, family, of a subsidiary corporation of the Southern Power Company, known as the "Southern Public Utilities Company," which last named company owns the public utility franchises in Charlotte, Winston-Salem, Reidsville, and other towns and cities, and is now engaged in furnishing hydroelectric power and lights to those municipalities.

The power is furnished by said defendant company to the public utilities company, one of its subsidiary companies, at its substations in Charlotte, Winston-Salem, and Reidsville, under a long-term contract extending to 1944 at a less rate than it now charges the plaintiffs for current furnished under substantially similar conditions at its substation near Salisbury. The defendant power company is now selling distributing power from its substation at Salisbury to the Vance Cotton Mill under a contract entered into in the past year, and since the war began, at a rate of 11 mills per Kw. H., for day service, and at a still lower rate for night service, and for the same service through the same substation under substantially the same conditions it is charging these plaintiffs 18 mills per Kw. H. The defendant power company is also furnishing current and power to the municipality of Salisbury from the same substation for water pumping services at a rate of 1 cent per Kw. H., and for like service under similar conditions is charging these plaintiffs 1 cent 8 mills per Kw. H., or nearly double.

The plaintiffs are among the largest single purchasers and consumers of power and current from the defendant's substation at Salisbury and Spencer, and on account of the growth of those towns and their increased demand for power and current the plaintiffs are unable to supply the same except by purchase from the defendant through its substation. This fact is well known to the defendant, and it declines to contract with the plaintiff to furnish it power and current for a less period than 5 years, and only at a far higher price, based on the present war price of coal, and threatens to cut off its supply of current unless it will submit to the discrimination, which would leave Salisbury and Spencer without lights for the homes and places of business of their people, and without power for the operation of their industrial plants or any means of operating the street railway.

The defendant's first proposal to renew its contract in 1917 was for a charge of 14 mills per Kw. H., which it raised at the expiration of the

contract in 1918 to a charge of 15 mills per Kw. H., when at that time it was selling power and current to Reidsville and its inhabitants under a contract for 10 years, entered into in 1917 at a rate of 14 mills.

To maintain a consistent and auxiliary supply of current and power in case of accident or low water the defendant power company has at several points along its line built steam plants, which it operates by the use of coal. Substantially all the power and current furnished these plaintiffs at Salisbury is generated by means of water, which cost the defendant power company 4 mills per Kw. H., and it now proposes to discriminate against the plaintiffs by requiring them to pay for current and power under a long-term contract based on war-time cost of coal, at a much higher rate than in any case it charges the cotton mills along its line or its subsidiary company (or alias), the Southern Public Utilities Company, for like service rendered under substantially similar conditions.

The defendant power company has no established rates of furnishing power in the absence of a contract, and no rates for such power has ever been filed with the Corporation Commission, and the Corporation Commission has never promulgated any rules or regulations to prevent discrimination by the defendant in furnishing power.

The defendant power company, on 8 February, 1914, filed with the Corporation Commission of North Carolina a partial schedule of its rates with the added statement: "Each case must be treated on its peculiar circumstances, and the rates are subject to the reasonable rules and regulations of the power company's charter. The filing of these rates by this company is in deference to the request of the commission, and must not be treated or considered and done because any legal obligation is imposed upon it to file the same. This company is advised that no legal obligation exists." The Corporation Commission expressed the opinion to the plaintiff that it had no authority under the act of the Legislature conferring upon it jurisdiction with respect to the regulation of public utilities to pass upon a question involving a contract between one public utility company and another public utility company as here presented.

The defendant power company, justifying its increase in rates charged these plaintiffs, says: "Which increased rate is absolutely necessary to earn any income upon its capital invested in its hydroelectric power plant."

The plaintiffs, replying to this proposition, state in substance that the Southern Power Company was incorporated in New Jersey, in June, 1905, by J. B. Duke and others, and has acquired rights and built power plants on the Catawba and Broad rivers in South Carolina, capable of developing a rated capacity of 88,000 h. p., and it has also built trans-

PUBLIC SERVICE Co. *v.* POWER Co.

mission lines as stated in the plaintiffs' complaint, and which is further illustrated by the annexed copy of the map of its lines issued by the defendant company.

The plaintiffs further say that the defendant company organized another corporation, which is controlled by it and is substantially an alias, known as the Great Falls Power Company, which was incorporated in New Jersey in November, 1909, and as owners of the Southern Power Company sold to themselves as owners of the Great Falls Power Company the three hydroelectric power plants which had been erected by the Southern Power Company. To take care of the cost of developing this property the defendant power company placed a mortgage upon the same in the sum of $10,000,000, $7,000,000 of which has been sold and the plaintiffs allege was substantially the actual cost of the property thus purchased and developed. In addition to this bonded indebtedness, the Southern Power Company issued to themselves $6,000,000 of 7 per cent accumulative preferred stock, and $4,000,000 of common stock. The same interests, and substantially the same men, in organizing the Great Falls Power Company as the holding company for the hydroelectric generating property took over this part of the development of the defendant company and executed back a contract at the same time which provided that the Great Falls Power Company should furnish its hydroelectric current to the defendant for a long term of years at the rate of 4 mills per Kw. H., and as a part of this transaction the defendant Southern Power Company guaranteed to hold the Great Falls Power Company free and clear of any liability under the mortgage; that the defendant company, acting for itself, and the same interest also acting for the Great Falls Power Company, required the company to issue $5,768,800 of 7 per cent accumulative preferred stock, and also $5,768,800 common stock, which said stock was substantially all turned over to the defendant Southern Power Company and its promoters, who now own the same. About 1 June, 1915, the defendant company offered for sale in the city of New York, through the National City Bank of that city, the $7,000,000 of bonds secured by first mortgage upon defendant's property, and the vice president of the defendant company, W. S. Lee, who was also vice president of the Great Falls Power Company, stated in a public letter, which was published at that date in a circular by the National City Bank, that the earnings of the defendant company, as officially reported for the year ending 30 April, 1915, were as follows:

Gross receipts ................................................................$2,485,789.79
Operating expenses (including taxes and rentals)........ 1,111,016.97
Net earnings ................................................................ 1,374,772.82
Annual interest on bonded indebtedness............................ 350,000.00

Balance............................................................................$1,024,772.82

And immediately thereafter this statement was made: "The net earnings for the year ending 30 April, 1915, were almost four times the interest requirements of the $7,000,000 first mortgage bonds which will shortly be outstanding."

The plaintiffs aver, on what they claim sufficient and reliable evidence, that the company's net earnings in 1917 were in excess of $2,000,000, while the interest paid on the bonded indebtedness, much of which was water, had not increased at all, and that in 1915 its net profits applicable to dividends were over $1,000,000, and at that time, after paying 7 per cent on the 6,000,000 cumulative preferred stock (*i. e.,* $420,000), there was still left applicable to the $4,000,000 of common stock $604,000, a net profit of 15 per cent, and at present probably this amount has been greatly increased. The plaintiffs are not advised as to how much dividend the defendant's stock in its holding company, the Great Falls Power Company, is earning at selling to itself hydroelectric current at 4 mills per Kw. Hour, which the defendant company is reselling at discriminating prices to its different customers according to the object it has in view, which may be either to encourage or to destroy, and thereby acquire these different plants.

The plaintiff urges, among the instances of discrimination, the following:

1. That the defendant is supplying current to the Southern Public Utilities Company, which is a company engaged in precisely the same character of business as these plaintiffs under a long-term contract at a rate much less than that charged and demanded of the plaintiff.

2. The defendant supplies current to sundry cotton mills for power and lighting mill villages at rates much less than that charged and demanded of these plaintiffs.

3. The defendant supplies current and power to various towns and municipalities under a long-term contract at rates much less than that charged and demanded of these plaintiffs.

4. The defendant supplies current to sundry cotton mills, entered into since the declaration of war, and since the abnormal increase of coal, at a rate much less than that charged and demanded of these plaintiffs.

The above are substantially, somewhat condensed, the statements and allegations of the complaint, which must be taken as admitted, as this case is presented upon the demurrer *ore tenus* thereto of the defendant.

The court overruled the demurrer, and the defendant appealed.

*Linn & Linn, Roberson, Dalton & Smith, Brooks, Sapp & Kelly for plaintiffs.*

*Cansler & Cansler, Osborne, Cocke & Robinson for defendant.*

CLARK, C. J.   By demurring *ore tenus,* "the defendant admits all of the allegations made by the plaintiffs, and if any part of the complaint presents facts sufficient for that purpose or can be gathered from it, under a liberal construction of its terms, the pleading will be sustained." *Hendrix v. R. R.,* 162 N. C., 15.

"Every reasonable intendment and presumption must be made in favor of the pleader.   It must be fatally defective before it will be rejected as insufficient."   *Brewer v. Wynne,* 154 N. C., 471.

In *Garrett v. Trotter,* 65 N. C., 432, *Pearson, C. J.,* says:   "A defect in pleading is aided if the adverse party plead over to, or answer the defective pleading in such a manner that an omission or an informality therein is expressly or impliedly supplied or rendered formal or intelligible. . . .   This principle commends itself so strongly by its good sense that it must be taken to underlie every system of procedure professing to aim at the furtherance of justice, and to put controversies upon their merits, and not allow actions to go off upon subtleties and refinements."

The facts in this case admitted, or not denied, are that:

1. The defendant Southern Power Company is a public-service corporation.   As such, it is subject to the laws of North Carolina governing public utilities companies.

2. As such public-service company, and by virtue thereof only, it enjoys and exercises the right and power of eminent domain, and as a consequence must discharge its duties subject to public regulation of its rates and conduct, and *without discrimination in the facilities it extends, and the rates it charges, under the same or substantially similar conditions.*

3. The defendant has a monopoly of the hydroelectric power supply and the markets therefor in the territory through which its lines extend.

4. It has been engaged more than ten years past in selling hydroelectric current to this plaintiff, to be resold at retail to citizens at Salisbury, Spencer, and East Spencer, High Point and Greensboro, and also to the Southern Public Utilities Company (which the defendant substantially owns and controls), to be resold at Charlotte, Winston-Salem, and Reidsville, and other points, and is selling its current to the municipalities of Lincolnton, Shelby, and Newton, to be resold to their respective citizens, and its business has become affected with a public use, and is for that reason also subject to public regulation of its rates and conduct, which rates *cannot be discriminatory* under like conditions or at the same points.

5. In 1914 it filed a statement with the Corporation Commission, denying that the commission had any authority to require it to file a schedule of its rates or to promulgate rules and regulations governing

it, and expressly asserted this power to be in itself by saying: *"Each case must be treated on its peculiar circumstances, and the rates are subject to the reasonable rules and regulations of the company,"* thereby asserting its exemption from control of the law and its superiority to public regulation of its conduct or rates.

6. Exercising the power, thus boldly declared that it possesses free from any control by the public, it declines to sell power and current to any consumer for a less period than 5 years, and then only under the terms which it sees fit to offer under its assertion of absolute sovereignty and freedom from control by law.

7. If a purchaser declines to accept any contract it offers, it charges such other higher rate as it may deem proper, for instance, it is charging the plaintiff 18.8 mills for a current which costs it 4 mills, and which it is selling to others at Salisbury at 11 mills, and which it is selling to the municipality at that point at 10 mills per Kw. H.

8. The defendant has entered into a long-term contract, extending to 1944, to furnish power to the Southern Public Utilities Company (which it substantially owns) at a less rate than it will sell to the plaintiff or any municipality in this State.

9. In 1917 it entered into a contract with its subsidiary (or *alias*), the Southern Public Utilities Company, to resell power at Reidsville at a figure so low that said utilities company is reselling power at a lower rate than the defendant power company will sell at wholesale to the plaintiffs.

10. The defendant company sells current only when reduced to not below 2,300 volts, and is not engaged in the retail power business. It induced the plaintiffs to discontinue their steam plant and purchase current from it on the basis of 11 mills, knowing that the current and power was to be resold in Salisbury and other towns in which plaintiffs do business.

11. It offers to sell the plaintiff current and power to be retailed by it, if the defendant is allowed without regal restraint to fix the price and terms of the contract.

12. It pleads want of authority in the courts to compel it to furnish power to the plaintiff upon the ground that it must not be restricted from discrimination in its rates.

13. The defendant Southern Power Company purchases its current at 4 mills per Kw. H. under a long-term contract, but declines to allow the plaintiff to share in the water rate of 4 mills, and requires the plaintiffs to pay it 18.8 mills, or more than 470 per cent profit.

14. The defendant Southern Power Company seeks to justify its increase in rates by alleging that it is necessary to do so to earn any dividend on the capital invested. The bonds, common and preferred

stock outstanding against this property exceeds $28,000,000, and over half the stock it has issued, the plaintiff avers that it can show, was not issued for expense incurred and represents only inflation.

15. The large increase in price for power of nearly 100 per cent charged the plaintiff, i. e., from 11 mills to 18.8 mills, has been applied only to the plaintiff. But in all cases it charges municipalities and other public utilities companies more for current and power than it charges its own subsidiary, the Southern Public Utilities Company, thereby pressing most heavily upon those least able to resist extortion, and who are for that reason most entitled to the aid of the State for its protection.

16. The properties and plant of the defendant Southern Power Company, and its affiliated and subsidiary companies, were acquired and the plants completed substantially prior to the declaration of war, and it is entitled to no increased charge by reason of the advance in coal and labor since that date by reason of the fact that the cost of its operations is based upon the employment of a very small number of employees, and it is entitled to earnings almost solely upon the capital invested in properties and plants which have not been largely increased.

17. Its current is received by it under a long-term contract, under which it has subcontracted to sell to its subsidiary, the Southern Public Utilities Company, until 1944, at a less rate than it charges any other consumer. It only pays 4 mills for this current, and the former rate of 11 mills (i. e., 1 1/10 cents) to the plaintiff would seem more than sufficient for proper remuneration, being a profit of 275 per cent.

18. The public policy of the State and of the National Government, which has been expressed not only in its Constitution from the beginning, and has been recently more fully expressed in statutes against trusts, and by decisions in the U. S. Supreme Court, forbids that this enormous aggregation of capital, charging exorbitant rates as appears by its own admissions in this record, should have, as it explicitly claims, the unrestricted right to fix its own rates and to discriminate between its customers, as if it were a private individual dealing in a competitive market.

It is of the highest importance that these claims of the defendant Southern Power Company to discriminate in the rates charged by it to purchasers under like conditions should be clearly denied by the courts. If the defendant is thus permitted to charge cotton mills in which the owners of the defendant are interested the rate of 11 mills, while it charges the plaintiffs and others mills and industries in which it is not interested 18.8 mills, or a higher rate than it does others in like condition, it follows that in a comparatively brief time the defendant will have the power to destroy, and thereby acquire the ownership of all the other cotton mills and industrial plants in the State, and thus create a cotton mill monopoly wherever its lines extend, for by reason of the approaching exhaustion

of the coal·mines and the interruption of their operations there can soon be left available for large industrial plants no other power than the monopolized water power of the State.

· The counsel for the defendant, upon the argument, stressed the contention that both plaintiff and defendant being public-service companies, and authorized by their respective charters to generate, and sell to the public, electric current that plaintiff could not. evade this duty and require the defendant to furnish it current and power to resell. This argument is plausible, but we think unsound and untenable upon the admitted facts in this record. The defendant's charter expressly authorizes it to sell current and power to other public utility companies for the purpose of resale. This charter power is not mandatory. Still, when the defendant elected to exercise this power, and ten years ago made a contract with the plaintiff, Salisbury & Spencer Railroad Company, to furnish current and power to be resold to the people of that city for the next succeeding ten years, and induced it to scrap its steam plant and to rely solely upon the defendant for its hydroelectric power, and thereafter made similar contracts with the other plaintiff, the North Carolina Public Service Company, for ten years for current to be resold in Greensboro and High Point, and contracted with its own subsidiary, the Southern Public Utilities Company, to furnish it current and power up to 1944, to be resold, it dedicated its property to this particular class of public use, and cannot discriminate in charge or service between the several members of this class, for this would be a license to discriminate among cotton mills as a class, furniture factories, etc.

Wyman on Public Service Corporations, sec. 10, says: "Those who conduct private enterprises may use many schemes, but those who offer public employment must not adopt any business policies which are anyways inconsistent with impartiality in discharge of their public duties."

It is well settled that the common-law obligation of equal and undiscriminating service clearly requires that the same charges shall be made to all consumers for the rendering of similar service. The Supreme Court of the United States, in *Western Union Tel. Co. v. Call Pub. Co.,* 181 U. S., 92, very fully discusses this doctrine, and in the course of its opinion says: "They are endowed by the State with some of its sovereign powers, such as the right of eminent domain, and so endowed by reason of the public service rendered. As a consequence of this, all individuals have equal rights, both with respect to services and charges. . . . To affirm that a condition of things exist under which common carriers anywhere in the country engaged in any form of transportation are relieved from the burdens of these obligations, is a proposition which, to say the least, is startling."

This obligation cannot be evaded, even though the purchaser of the current may be to some extent a competitor. This question is very fully discussed in *Postal Cable Telegraph Company v. Cumberland T. & T. Company*, 177 Fed., 726, *et seq.* The Court there says: "The portion of the sovereign power with which telephone companies are as common carriers endowed is likewise given them for the purpose of serving not merely part of the public, but all of the public; and all persons composing the public, even though they be, in a sense, competitors, are entitled to use their privileges upon equal terms, and 'have equal rights both in respect to service and charge.'"

The Corporation Commission of California, in an opinion rendered 23 July, 1917, in the matter of the application of the Great Western Power Company, discussing the right of the power company to arbitrarily select its consumers, states "that the duties and obligations which it has undertaken do not contemplate the right on its part to select the consumers it will serve"; and further says: "It is clearly the duty of the public utility, situated as is the petitioner, to supply every reasonable demand for service at nondiscriminatory rates, and under just terms and conditions. Nor can this duty be avoided, modified, or abridged in any manner whatsoever, either by contract between the utility and any private interest or by the maintenance of unsuitable facilities. . . . In case of a temporary insufficient supply of electric energy to meet all reasonable demands in the territory which petitioner has elected to serve, the available supply will, of course, be prorated upon an equitable basis, consideration being given to the necessities of the public, irrespective whether or not these necessities arise directly or through the medium of another utility."

The foregoing is a just and reasonable statement of the common-law obligations resting upon public utility companies such as the defendant.

It appears from the investigation made by Congress into the water power of the country that 94 per cent of the water power of this State has been acquired by corporations which are either already owned or can soon be acquired by the Southern Power Company, or made subsidiary by the use of the same method of underbidding, and afterwards acquiring competitive plants, by which means the American Tobacco Company and the Standard Oil Company acquired the monopolies which since have been to some extent abated by the courts in pursuance of the action of Congress taken at the demand of a sound and overwhelming public opinion.

The methods being used by the defendant company by discrimination in the prices to consumers is identical with that which built up the Standard Oil Company, the American Tobacco Company, and other

great trusts which came under the ban of Congressional enactment, and which were condemned by decisions of the U. S. Supreme Court and by decrees of dissolution.

The control of the defendant corporation is by the same men who organized the American Tobacco Company, which was ordered dissolved in the case of *U. S. v. American Tobacco Co.,* 221 U. S., 106 (October Term, 1910), in which the U. S. Supreme Court, in an opinion by *Chief Justice White,* held that J. B. Duke, the president of the Tobacco trust, and the president of this defendant company, was individually responsible for the violations of law committed by that concern. · The Court, in that opinion, speaking of the unlawful practices which were identical in all points with those in this case, as charged in the complaint, and admitted by the demurrer, recited the many facts which it held proven (p. 182) "by the ever present manifestation which is exhibited of a *conscious wrong doing* by the form in which the various transactions were embodied from the beginning, ever changing, but ever in substance the same. Now the organization of a new company, now the control exerted by the taking of stock in one or another, or in several, so as to obscure the result actually attained, nevertheless uniform in their manifestations of the purpose to restrain others, and to monopolize and retain power in the hands of the few, who it would seem, from the beginning contemplated the mastery of the trade, which practically followed. By the gradual absorption of control over all the elements essential to the successful manufacture of tobacco products, and placing such control in the hands of seemingly independent corporations, serving as perpetual barriers to the entry of others in the tobacco trade."

The Court further says (p. 181) of that combination and monopoly: "The history of the combination is replete with the doing of acts which it was the obvious purpose of the statute to forbid, so demonstrative of the existence from the beginning, of a purpose to acquire dominion and control of the tobacco trade, not by the mere exertion of the ordinary right to contract and to trade, but by methods devised in order to monopolize the trade by driving competitors out of business, which were ruthlessly carried out, upon the assumption that to work upon the fears or play upon the cupidity of competitors would make success possible." The above paragraphs were repeated and concurred in by *Judge Harlan* (pp. 189, 190) as "undoubtedly" a just "characterization of this monster combination." No judge dissented.

The story of high finance and monopoly record, as shown in that case, is displayed along the same lines in this present enterprise. In 1905 the same J. B. Duke and his associates, as disclosed by the undisputed facts in this record, incorporated the defendant company in New Jersey, in which State the American Tobacco Company and its subsidiary com-

panies, or *aliases,* were chartered. The defendant company acquired water rights and built power plants on the Catawba and Broad rivers in South Carolina. Afterwards the same Duke and associates organized the Great Falls Power Company, also chartered in New Jersey in 1907, and as owners of the Southern Power Company, on 1 March, 1910, sold to themselves, as owners of the Great Falls Power Company, the three hydroelectric plants which had been erected by the Southern Power Company. To take care of the cost of developing this property, the owners and promoters of the defendant power company placed a mortgage upon the same in the sum of $10,000,000, which it is alleged is substantially the cost of the property purchased and developed. In addition, they issued to themselves $6,000,000 of 7 per cent cumulative preferred stock and $4,000,000 of common stock, and substantially the same interest and men organizing the Great Falls Power Company as the holding company for the hydroelectric generating properties, took over its part of the defendant company, and immediately executed back a contract which provides that the Great Falls Power Company shall furnish its hydroelectric current to the defendant for a long .term of years at the rate of 4 mills per Kw. H. The defendant company and its promoters, acting for themselves and for the Great Falls Power Company, caused the latter company to issue $5,768,800 of 7 per cent cumulative preferred stock, and also $5,768,800 common stock, which said stock was substantially all turned over to the defendant company and its promoters, who now own the. same. Thereafter the same J. B. Duke and associates organized a subsidiary retail company, known as the Southern Public Utilities Company, which was principally owned by himself and immediate family and controlled by him. The company acquired a monopoly of the retail electric power business in Charlotte, Winston-Salem, and Reidsville, the latter under methods discussed in *Allen v. Reidsville,* 178 N. C., 513, 527-537. Thus these two corporations, under the same control, monopolized the wholesale supply of current and the retail distribution of same wherever a subsidiary company could get control of the municipal franchises. It is unnecessary to trace the transactions of this company in all its manifestations, but enough has appeared to show that the existence and operation of a water power monopoly with power to discriminate in its rates would be a menace which neither the courts nor the public can disregard.

The object of this action is not to declare or fix rates; nor is it to have the rates declared exorbitant, however clearly this may appear, but to prevent that discrimination between the purchasers of its power, which is a method by which the Standard Oil Company, the American Tobacco Company, and all other trusts have crushed opposition and enlarged their power and increased their accumulations to a point which made

3—179

them a menace to government by the people, and caused their dissolution by judicial decree. *Griffin v. Water Co.,* 122 N. C., 209.

The argument is presented that even though an unlawful discrimination in rates exists, still the courts are without power or procedure to correct the evil. Such judicial impotency does not exist in North Carolina. This Court, in the *R. R. Discrimination cases,* 136 N. C., 479, and 141 N. C., 171, established the rule and procedure by which such question should be determined. *Justice Connor,* speaking for the Court in the latter case, says: "However the courts construe statutes making penal or criminal a violation of the equality of right, when we come to deal with the question, in the enforcement of the civil right of the citizen, we must construe the law so that the right is secured and the remedy for its infringement given. This is the keynote of the decisions both in England and this country."

It will not be difficult for the Court, upon the hearing, to determine the lowest rate charged by the defendant for current and power furnished cotton mills, factories, municipalities, or other public-service companies, under the same or substantially similar conditions. The lowest rate thus established will automatically become the proper rate to be charged the plaintiffs for such service. Otherwise, the defendant will still be unlawfully discriminating against the plaintiffs.

The remedy sought here by a mandamus to compel the defendant company to concede to the plaintiffs the same rates that it grants to others, especially to its subsidiary companies, is the proper one, as stated by *Allen, J.,* in *Walls v. Strickland,* 174 N. C., 299, which was to compel a telephone public-service company to discharge its duties impartially and without discrimination. The defendant in that case pursued exactly the same course as in this in regard to the jurisdiction of the Court, and "excepted and appealed upon the ground that telephone companies being subject to the control and regulation of the Corporation Commission, the courts have no jurisdiction of the action."

In that case *Judge Allen* said: "The error in the position of the defendants is in failing to distinguish between the regulation and control of telephone companies, which, as to individuals and corporations, are committed by statute to the Corporation Commission (Rev., 1096; ch. 966, Laws 1907), whether exclusively so or not we need not say, and the refusal to perform a duty to the plaintiff, arising upon facts that are established. If the duty exists upon the facts found, there is nothing for the Corporation Commission to hear and investigate, and it only remains for the courts to compel performance of the duty.

"The question was considered in *Godwin v. Tel. Co.,* 136 N. C., 259, prior to the amendment of 1907, it is true, but when, as said in the opinion, telephone companies were placed by the Corporation Commis-

sion Act on the same footing as to public uses as railroads, it was then held that telephone companies, serving the public, must discharge their duties impartially and without discrimination, and that the writ of mandamus, issued by the courts, was the proper remedy to enforce the performance of the duty. . . . This case was approved in *Tel. Co. v. Tel. Co.,* 159 N. C., 16, decided after the amendments of 1907, and the jurisdiction to enforce performance of a duty by mandamus was recognized and exercised."

In *Tel. Co. v. Tel. Co.,* 159 N. C., 11, *Hoke, J.,* said: "In regard to the form of remedy available where, as in this State, the same Court is vested with both legal and equitable jurisdiction, there is very little difference in its practical results between proceedings in mandamus and by mandatory injunction, the former being permissible when the action is to enforce performance of duties existent for the benefit of the public, and the latter being confined usually to causes of an equitable nature and in the enforcement of rights which solely concern individuals. High on Injunctions (4 ed.), sec. 2. Owing to the public interests involved in controversies of this character, it is generally held that mandamus may be properly resorted to. *Mayhan v. Telephone Co.,* 132 Md., 242; *Yancy v. Telephone Co.,* 81 Ark., 486; *Godwin v. Tel. Co.,* 136 N. C., 258."

The defendant asserts that it has a right to select customers to whom it will sell current and power, and to discriminate at will as to its prices. To this it may be said:

First. The General Assembly declares "all water power, hydroelectric power, and water companies now doing business in this State, whether organized under general or private laws of this State, or under the laws of any other State or county, shall be deemed to be public-service companies and subject to the laws of this State regulating public-service corporations." The enactment of this statute was procured by foreign water power companies, for by Rev., 3060, and 2575, this State, like most, if not all others, denied the right of eminent domain except to companies chartered by this State.

Second. It enjoys the privileges and has accepted the benefits of the right of eminent domain, and hence is subject to public control. *Griffin v. Water Co.,* 122 N. C., 206.

Third. It has expressly devoted its property to the public use over a period of ten years by connecting its lines with and furnishing electric current and power to other public-service corporations, as well as to the plaintiff, and to municipalities, with a knowledge that the current so purchased was being resold for the benefit of the inhabitants of the various cities, and its property has therefore become affected with a public use.

Fourth. It enjoys a monopoly of the hydroelectric business at Salisbury and in Western North Carolina.

Suppose a railroad corporation should have the power at will to charge one set of merchants at a given town a higher freight rate than it charges others under like conditions, how long would it be before those charged the higher price would be forced out of business? Yet a railroad is by no means as much a monopoly as the Southern Power Company, for in many towns there are competing railroads, but in this case it appears by the averments of the complaint, which are admitted by the demurrer, that throughout the territory where the defendant operates there is no other hydroelectric power, and that plants operated by coal cannot compete in prices.

At the same point and under like conditions the defendant must make the same charges to all alike. It is only on these terms that a monopoly is endurable at all. If it has not enough power at any one point for all applicants, it is its duty to give "miller's turn," that is, to furnish water power for heat and lighting in the order in which the applicants apply for contracts and at the same price to all whom it furnishes.

That hydroelectric companies must furnish at the same price all parties without discrimination, under like conditions, is held in *Water Works Co. v. Brown,* an Alabama case which is reported 1915 D (L. R. A.), 1086, with copious notes, all of which are to that purport.

Mandamus is the proper and only remedy to compel the defendant to continue to furnish power and light to the plaintiff company on the same terms that it is furnishing others under like condition.

The real point in this case is not whether the rates charged any one are exorbitant, nor is it sought to have the rates fixed by the courts. The sole object of this proceeding is to forbid discrimination between purchasers in like conditions.

But as much was said in the argument and in the pleadings as to the charges, it may be well to translate into every-day language the rates set out in the pleadings and in the arguments:

One thousand watts is a kilowatt, and 1,000 watts an hour is a kilowatt hour, or Kw. H. The rate of 4 mills per Kw. H. (at which the Southern Power Company obtains its current from its subsidiary company, the Great Falls Company) amounts to nearly 3 mills per horse power per hour. A horse power is 746 watts, or roughly, three-fourths of a kilowatt.

The rate of 11 mills per Kw. H., at which the defendant had been reselling its power to the plaintiff, and is still selling it to many other companies, is 8.21 per h. p. per hour, a profit of about 275 per cent.

The rate of 1.88 cents, at which the defendant now offers to sell its

power and current to the plaintiff is 1.40 cents per h. p. per hour, or a profit of nearly 470 per cent.

The rate of 15 cents (i. e., 150 mills) per Kw. H., at which some local companies resell to the individual consumer, amounts to 11 1/5 cents per h. p. per hour, which is a profit by the latter of 800 per cent, as alleged in defendant's answer.

As the Great Falls Company must make a profit to pay its interest and dividends when it sells to the Southern Power Company at 4 mills, it must follow that there is an almost incalculable profit taken out of the public between the actual cost of the power produced by the Great Falls Company and sold to the Southern Power Company with a profit, at the figure of 4 mills, and the 11 1/5 cents, or 112 mills per h. p. per hour charged consumers of the lights in the towns when they pay 15 cents per kilowatt per hour, or 11 1/5 cents per h. p. per hour. The current when used by the consumer at his home in the city will cost approximately 37½ times the original 4 mills per kilowatt (which is 3 mills per h. p. hour) paid by the defendant Southern Power Company to the Great Falls Company, its subsidiary company, and the Great Falls Company out of the price which it charges the Southern Power Company has then already made a big profit, out of which to pay interest and dividends on its heavily watered stock and bonds.

The great profit made by the initial company in generating power is nowhere better proven, aside from the allegations in the complaint and answer in this case, than in the recent report on the water power hearing in Congress, which shows that in Canada, under the reforms instituted by government in restricting the profits, water power and lights are now furnished at 1⅓ cents per Kw. H. (kilowatt hour) to consumers, instead of 15 cents, which is the rate many consumers in this State are now paying for lights and power from the local light and power company. The answer of the defendant in this case claims that the plaintiff and other similar companies are reselling to their patrons at 800 per cent profit over the price they are paying to the defendant. It is but fair to say, however, that the local companies have very heavy expenses necessarily, and whether the 800 per cent advance on the prices they are paying is unreasonable or not does not arise in this case. The allegation is not proven and is not admitted by demurrer or otherwise. But if true, the remedy is by application to the Corporation Commission to fix reasonable rates. Extortion by the plaintiff, if shown, will not justify discrimination by the defendant.

As the defendant claims that it must advance its price to the plaintiff beyond the 11 mills which it has been charging to the plaintiff, and which is 275 per cent over what it pays the Great Falls Company, and claims therefore that it must increase its charge to the plaintiff to 18.8 mills

(which is 470 per cent of the cost to it of the power), it is proper to observe that the operations of the defendant Southern Power Company does not call relatively for so large a number of men or other expenses, and that at the charge to the plaintiff of 1.1 (*i. e.,* 11 mills) it is shown that it has paid large dividends on its greatly inflated stock and bonds.

If the profits, which it clearly appears are taken out of the public by the defendant and its subsidiary companies, are possible now, what will be the result if this enormous and steadily growing aggregation of wealth were permitted to charge its own rates, as it claims it has a right to do, without supervision by governmental authority, and has full power to discriminate against those municipal and industrial plants and factories which it may desire to crush out and buy? There must be considered, too, that with the constantly decreasing competition from the coal supply, which must be conserved to prevent exhaustion, and which is so frequently interrupted by strikes, the power the defendant claims of unrestricted rates and of absolute right to discriminate between purchasers would make it a despotism beyond a parallel in history.

It must be remembered that the men who are organizing this mighty power and moving on to their consummation are the same who organized the American Tobacco Company, with a capital of $350,000, and in a few years made it into a combination of $350,000,000, *i. e.,* $1,000 for every $1 they claimed to have put in, and that the Congress and the Supreme Court of the United States were forced to take hold and cause its dissolution as an enemy of the Republic. The history of that movement and the names of the men indicted, 29 in number, among them the leaders in this organization, are set out in the *United States v. American Tobacco Co.,* quoted above, and more than one of the leaders in this movement appear also as defendants in the proceedings to dissolve the Standard Oil Company, which is reported in the same volume (221 U. S.) of the United States Supreme Court Reports.

The highest considerations of the public welfare require that the rates of this company and their subsidiaries, and the rates of those who, like the plaintiff, resell the current for light and power, shall be strictly supervised and reduced to a reasonable profit.

But, as already said above, the sole question in this case is not what is a reasonable rate, nor are the courts called upon to fix the rate (not in the first instance at least), but shall the defendant be required to sell its current and power to all alike, without discrimination in prices, when under like conditions. The court below properly overruled the demurrer.

Affirmed.

BROWN, J., concurring: It is admitted in plaintiff's brief that this action is not brought for the purpose of asking the Court to regulate

and fix the schedule of rates which the defendant company charges consumers, but for the sole purpose of compelling the defendant to continue to furnish plaintiffs current, and to do so without discrimination for like service to consumers similarly situated.

The defendant filed an answer to the complaint and then demurred *ore tenus,* thereby admitting the truth of the facts stated in the complaint. Upon these facts I am of opinion that plaintiff is entitled to the relief demanded, and that mandamus is the proper remedy. I concur in the judgment of the Court overruling the demurrer and affirming the judgment of Judge Shaw.

Allen, J., dissenting: The principle announced in the opinion of the Court that corporations affected with a public use must serve the consumer impartially and without discrimination is not questioned, and it is a principle which should be rigidly enforced for the benefit of the public, but the questions presented by this appeal are altogether different.

The plaintiffs are not in my opinion consumers, and not within the protection of the principle, and no party to this action represents the man who must ultimately pay the profits of both plaintiff and defendant. The plaintiffs, the Public Service Company, is a corporation, with power in its charter to generate electricity and sell it to the public, and owns and operates the railway company, the other plaintiff, one being subsidiary to the other, following in large measure the methods of the American Tobacco Company and the Standard Oil Company, condemned by the Supreme Court of the United States.

The plaintiff has failed to exercise its powers, and for the last ten years, instead of generating its own electricity, as it had the right to do, has bought its power from the defendant and sold it to the consumer at a profit, stated to be 800 per cent, and this statement is practically undenied, thus introducing between the consumer and the source of power, the plaintiff, as middle-man, with all the attendant evils.

The contract with the defendant for service existing during the last ten years having expired, and being unable to agree upon a new contract, except at an increased rate, this action has been instituted in the Superior Court, and the prayer of the complaint is as follows:

"Wherefore, plaintiffs pray for a writ of mandamus against the defendant:

"1. To compel the defendant power company to furnish and to continue to furnish electric current and power from its substation at Salisbury to the plaintiffs for the use and benefit of the cities of Salisbury and Spencer and East Spencer, and the inhabitants thereof, as heretofore furnished by it.

"2. To compel the defendant power company to furnish such service, power, and current at uniform and reasonable rates and without discrimination for like service, under the same or substantially similar conditions."

I do not think the action can be maintained under these conditions for the following reasons:

1. If what is said of the defendants in the opinion of the Court is true, and if the plaintiffs have failed to exercise the powers conferred in their charters, as they admit, preferring to buy power from the defendant, which they sell to the consumer at a profit of 800 per cent, I do not think either party has any standing in court, and certainly the plaintiffs ought not to be aided by judicial decree to continue a business so hurtful to the public.

2. If the Court will inquire into the rights of the parties, and the defendant can be *compelled* to furnish power to the plaintiff at *any rate,* it gives the opportunity to destroy the chartered rights of the defendant, and to render it impossible for it to perform its duties to the public.

The plaintiff, seeing that it can avoid the expense of constructing and operating a plant, may enlarge its operations and make new demands on the defendant, or new corporations may be formed, with power to generate electricity and sell to the public, who, profiting by the example and experience of the plaintiff, will build no plants, but will demand power of the defendant on the same terms as the plaintiff, and in this way the operations of the defendant may be limited to furnishing power to competitive corporations.

3. The plaintiff is not entitled to protection as one of the general public, and cannot secure power from the defendant except by contract between the parties. So far from being one of the public, its position is antagonistic because it sells to the public, and it would seem at the highest rates.

The business in which the plaintiffs are engaged, and their service is not a dependent business or service, but is entirely independent. The plaintiffs are chartered and authorized to generate electricity as well as to distribute it, and it is as much their public duty to do one as it is to do the other, and the obligation to do each is the same. They have no right to rid themselves of either one of their public obligations by undertaking to pass either over to the defendant. They would have as much right to require some other company to distribute electricity for them as they have to require this company to generate electricity and sell it to them to be resold by them at a profit.

*Express Co. v. R. R.,* 111 N. C., 463, is the leading case in this State. The proceeding was instituted before the Railroad Commission; and petitioner, express company, sought to compel certain railroads who

were made respondents, to furnish it with facilities for doing an express business the same as they were furnishing another express company, alleging that the railroads were discriminating against petitioner in furnishing such facilities to such other express company, while denying them to petitioner. Section 4 of the act constituting the commission provided: "That it shall be unlawful for any common carrier, subject to the provisions of this act, to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The Court, following the Supreme Court of the United States (*Express cases,* 117 U. S., 1), decided that neither at common law nor under the statute did the railroads owe any public duty to the express company to furnish it with the facilities demanded; that the public duty of the railroads was to serve the shipping and traveling public, and not another carrier; and that there was no discrimination against petitioner, because the railroads were furnishing facilities similar to those demanded by petitioner to another express company. The Court held that the furnishing of such facilities by the railroads to such other express company was a matter of special contract between them.

*Chief Justice Shepherd,* after citing authorities, says: "The controversy is solely between the respective corporations, and the real question is not whether the defendant railroad companies are authorized to do an express business for themselves, nor whether they must carry express matter for the public on their passenger trains, in the immediate charge of some person especially appointed for that purpose, nor whether they shall carry express freight for the complainant company as they carry like freight for the general public, but whether it is their duty to furnish the complainant with facilities for doing an express business upon their roads, the same in all respects as those they provide for themselves or afford to any other express company."

Again: "The defendants have not refused to act as common carriers, or to transport any article tendered by the complainant. They have refused to afford it facilities for carrying out an express business upon their roads, and this we have seen they had a right to do. In this refusal they were not guilty of making any discrimination or preference within the act of the Legislature. As we have seen, the Supreme Court of the United States has said that they are under no obligation to carry another company, and the mere fact that they are carrying another company does not amount to an unjust or unreasonable preference."

In the *Express cases,* 117 U. S., 1, certain express companies sought

to compel the railroad companies to give them the same facilities for their business furnished other express companies. The Court denied the application, saying, among other things: "The reason is obvious why special contracts in reference to this business are necessary," and then proceeds to show that if the railroads were compelled to yield to the demands of the plaintiffs that these might be increased until the railroads could not perform their duties to the public, a condition which may soon confront the defendant in this action.

The Court adds: "If the general public were complaining because the railroad companies refused to carry express matter themselves on their passenger trains, or to allow it to be carried by others, different questions would be presented," a remark very pertinent to the present controversy.

These authorities, in my opinion, cover the principle involved in this appeal, and are decisive against the plaintiff.

If the courts cannot compel railroads, which are public-service corporations, to give the same service to one express company that it gives to another, which is the decision of the Supreme Court of this State and of the United States, from what source, and by what course of reasoning can it be said that the courts have the power to require one electric company to furnish power to another electric company, its competitor in business, on terms similar to those given to others?

4. The purpose of the action is to fix the rates which the defendant shall charge the plaintiff, and this is primarily a legislative, not a judicial function, and is to be exercised by the Legislature itself, or by a commission acting under its authority.

That this is the purpose of the action is apparent from the whole scope of the pleadings, and the prayer for judgment, in which the Court is asked to compel the defendant to furnish service at reasonable rates.

Who is expected to say what rates are reasonable if not the Court? Certainly the plaintiff will not be permitted to say what the defendant shall charge, and it will not consent for the defendant to do so, and if neither of these, and the Court is not asked to do so, what practical result can follow this litigation?

In *Munn v. Illinois,* which is the leading authority on the power to deal with the rates of public-service corporations, the Court says: "It is insisted, however, that the owner of property is entitled to a reasonable compensation for its use, even though it be clothed with a public interest, and that what is reasonable is a judicial and not a legislative question.

"As has already been shown, the practice has been otherwise. In countries where the common law prevails, it has been customary from time immemorial for the Legislature to declare what shall be a reasonable compensation under such circumstances, or, perhaps more properly

speaking, to fix a maximum beyond which any charge made would be unreasonable. Undoubtedly, in mere private contracts, relating to matters in which the public has no interest, what is reasonable must be ascertained judicially. But this is because the Legislature has no control over such a contract. So, too, in matters which do affect the public interest, and as to which legislative control may be exercised, if there are no statutory regulations upon the subject, the courts must determine what is reasonable."

In *Mitchell Coal & Coke Co. v. Pennsylvania R. Co.*, 230 U. S., 255: "The courts have not been given jurisdiction to fix rates or practices in direct proceedings, nor can they do so collaterally during the progress of a lawsuit when the action is based on the claim that unreasonable allowances have been paid. If the decision of such questions was committed to different courts with different juries, the results would not only vary in degree, but might often be opposite in character—to the destruction of the uniformity in rate and practice which was the cardinal object of the statute."

The Supreme Court of Wisconsin, in *City of Madison v. Madison Gas and Electric Company*, 108 Northwestern, 65, in holding that the courts have no jurisdiction to fix rates, says: "This power of the State is in its nature legislative, and has always been exercised either directly by the legislative branch of the government or by delegation of it to municipal corporations or some other appropriate agency. Whether existing or prescribed rates and charges for a public service afford a reasonable compensation is a judicial question. In the very nature of the right to regulate these matters, between the public and those engaged in performing the service, it must follow that courts cannot prescribe a schedule of rates and charges as the prescribed quantum of compensation which is to be awarded for future services, because it is the legislative prerogative to make and prescribe the rules which shall regulate the relations between persons and their acts as they arise in the affairs of life. When, however, such rules have been enacted as law, then the judiciary is vested with the authority to construe and apply them to the affairs they were intended to regulate and control. These two functions which are recognized as distinct and separate in the fundamental organization of our Government are not to be encroached upon or curtailed by the other."

In this State the Legislature has taken charge of the question and has committed the power to fix rates to the Corporation Commission, and there is no reason for the courts to exercise this jurisdiction, which is not within their proper and legitimate functions.

Chapter 127, Laws 1913, provides: "Section 1. The Corporation Commission shall have such general power, control, and supervision of

all electric light, power, water, and gas companies and corporations, other than such as are municipally owned or conducted, and of all persons, companies, and corporations, other than municipal corporations, now or hereafter engaged in the business of furnishing electricity, electric light, current or power, and gas, as it now has over railroad and other corporations as set forth in chapter twenty of the Revisal of one thousand nine hundred and five, and the acts supplemental and amendatory thereof.

"Section 2.    That the said commission shall have full power and authority to fix, establish and regulate the rates or charges of such persons, companies, or corporations, to make such investigations and orders, and establish and enforce rules, regulations, fines, and penalties as it has over railroads.

"Section 6.    The Corporation Commission shall make reasonable and just rules and regulations:

"1. To prevent discrimination in furnishing electricity, electric light, current, power, or gas."

WALKER, J., concurs in this opinion.