PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TIME WARNER ENTERTAINMENT-
ADVANCE/NEWHOUSE PARTNERSHIP,
            *Plaintiff-Appellant,*

v.                                      No. 06-1974

CARTERET-CRAVEN ELECTRIC
MEMBERSHIP CORPORATION,
            *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
James C. Dever III, District Judge.
(4:05-cv-00146-D)

Argued: September 27, 2007

Decided: October 31, 2007

Before NIEMEYER and MICHAEL, Circuit Judges, and
T. S. ELLIS, III, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Michael and Senior Judge Ellis joined.

## COUNSEL

**ARGUED:** Gardner F. Gillespie, III, HOGAN & HARTSON, L.L.P.,
Washington, D.C., for Appellant. Pressly McAuley Millen, WOM-
BLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Raleigh, North

Carolina, for Appellee. **ON BRIEF:** Gary J. Rickner, WARD & SMITH, P.A., New Bern, North Carolina; Paul A. Werner, HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellant.

---

**OPINION**

NIEMEYER, Circuit Judge:

For many years, Carteret-Craven Electric Membership Corporation, a North Carolina electric cooperative, had a pole-attachment agreement with Time Warner Entertainment-Advance/Newhouse Partnership, a cable service provider, permitting Time Warner to attach its cable to Carteret-Craven Electric's utility poles. The initial fee in the 1997 renewal of the agreement provided that Time Warner pay $6 per pole. After Carteret-Craven Electric terminated that agreement in 2004, it demanded an increase to $20 per pole as a condition of any new agreement.

Claiming that the proposed new rate was unreasonable and discriminatory, Time Warner refused to enter into a new agreement. Instead, it commenced this diversity action, requesting a declaratory judgment that Carteret-Craven Electric, in charging excessive and discriminatory rent for pole attachments, violated (1) a *statutory duty* imposed on electric cooperatives in North Carolina to charge only reasonable and nondiscriminatory rates, *see* N.C. Gen. Stat. §§ 117-16, 117-16.1, and (2) a *common law duty* as an electric utility to charge only reasonable and nondiscriminatory rates, *see Salisbury & Spencer Ry. v. Southern Power Co.*, 101 S.E. 593 (N.C. 1919). The district court granted Carteret-Craven Electric's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) as to both claims, and Time Warner appealed the district court's ruling, but only as to its common law claim.

Because the common law duty requiring an electric public utility to charge reasonable and nondiscriminatory rates for electric service does not clearly apply to pole-attachment agreements and we are not free to extend North Carolina common law to hold that it does, we affirm.

I

Carteret-Craven Electric, organized as an electric cooperative under Chapter 117 of North Carolina's General Statutes, provides electric service to customers in Carteret, Craven, Jones, and Onslow Counties on the southeastern coast of North Carolina. For many years, Carteret-Craven Electric leased excess space on its utility poles to Time Warner pursuant to a negotiated license agreement between them. In the 1997 renewal of their agreement, Time Warner agreed to pay $6.00 per pole for the first 12 months of the contract, thereafter to be adjusted by "an amount equal to the annual percentage change in the *Handy-Whitment Index of Public Utilities*, Bulletin 139, Southeastern Region, F.E.R.C. account 364, Poles, Towers, & Fixtures . . . ."

In July 2004, Carteret-Craven Electric legally terminated the 1997 agreement and proposed a new license agreement, with a pole-rental rate of $20.07 per pole. It stated that it calculated this figure by applying the Federal Communications Commission's formula for determining the proper rental rate for pole attachments charged by federally regulated utilities to telecommunications service companies. When Time Warner objected to the new rate as too high and pointed out that Carteret-Craven Electric's application of the FCC formula was erroneous and that the properly calculated FCC rate was actually $11.96 per pole, Carteret-Craven Electric declared that it intended nonetheless to charge the $20.07 rate.

Following an impasse in negotiations, Time Warner commenced this action. In its complaint, it alleged that the $20.07 pole-attachment rate far exceeded Carteret-Craven Electric's cost in making pole space available and that it "far eclips[ed] the rates that would be obtained by use of rate methodologies used by the FCC or other state utility commissions." It also alleged that the $20.07 rate exceeded the rates paid by Time Warner under pole-attachment agreements with other utilities in North Carolina. Finally, it alleged that "on information and belief, [Carteret-Craven Electric] charge[d] a similarly-situated attaching entity, Sprint Corporation, a pole-attachment rental rate of less than $10 per pole." Time Warner grounded Count I of its complaint on Carteret-Craven Electric's statutory duty under North Carolina's General Statutes, §§ 117-16 and 117-16.1 (requiring an

electric cooperative to charge reasonable and nondiscriminatory rates for its service to customers), and it grounded Count II on Carteret-Craven Electric's common law duty, as it articulated the duty, "to offer its members reasonable, cost-based, nondiscriminatory rates for electric power and any other goods or services that it provides by way of its property which is devoted to the public use."

The district court granted Carteret-Craven Electric's motion to dismiss, concluding, with respect to the statutory claim, that "entering into a license agreement with a cable company to provide space on its poles does not constitute a 'service' or 'services' as defined in Chapter 117 [North Carolina General Statutes]," and §§ 117-16 and 117-16.1 "do not provide authority for this court to conclude that defendant may assess only a reasonable and non-discriminatory pole-attachment rate." The court concluded, with respect to Time Warner's common law claim, that it could not locate any case interpreting North Carolina law "to extend the common law prohibition against discriminatory rates to include negotiated prices for business agreements that are unrelated to the basic statutory purpose of an entity such as [Carteret-Craven Electric]," and that it should not "create" or "expand" North Carolina common law.

From the district court's order dated August 11, 2006, Time Warner appealed, but only with respect to its common law claim. Time Warner contends on appeal that the common law duty imposed on utilities in North Carolina to charge only reasonable and nondiscriminatory rates for service also applies to Carteret-Craven Electric's proposed rate under the pole-attachment agreement and that the amount Carteret-Craven Electric seeks to charge for pole attachments is in fact unreasonable and discriminatory.

II

Resting upon the North Carolina common law principle that a public utility must "render [its] service at uniform and reasonable rates and without discrimination," *see Clinton-Dunn Tel. Co. v. Carolina Tel. & Tel. Co.*, 74 S.E. 636, 639 (N.C. 1912), Time Warner argues that a public utility also has a duty to charge reasonable and nondiscriminatory rates "for use of [its] property" used in providing its service. Thus, Time Warner claims that Carteret-Craven Electric must

lease the excess space on its utility poles at reasonable and nondiscriminatory rental rates and that Carteret-Craven Electric is violating this common law duty because the rate that it proposes is both unreasonable and discriminatory. The proposed $20.07 per pole rate is more than three times the rate that had been established in the prior contract; it is virtually double the rate calculated under the federal Pole Attachment Act; and it far exceeds the rate that Time Warner has to pay other utilities in North Carolina. Moreover, as Time Warner alleges in its complaint, this rate is discriminatory in that Carteret-Craven Electric only charges Sprint Corporation, which Time Warner claims is a similarly situated attaching entity, $10.00 per pole to string its telephone lines, approximately one half of what it proposes to charge Time Warner.

Carteret-Craven Electric agrees with Time Warner that public utilities have a common law duty to sell their "service" to customers at reasonable and nondiscriminatory rates. It argues, however, that it is an electric utility and is not in the business of providing public access to excess space on its utility poles or on any other property it owns. It asserts, "there is simply no basis for finding a common law duty of non-discrimination or reasonableness for an electric membership corporation with respect to anything other than its sales of electric energy."

The governing principles are not in dispute. Public utility companies, such as those in the business of transmitting electricity locally to consumers, "are natural monopolies created by the economic forces of high threshold capital requirements and virtually unlimited economy of scale." *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351-52 n.8 (1974). It would make little economic sense for competitors to invest in duplicative sets of electrical poles and transmission lines. Because of the impracticalities of competition, regulation is necessary as a "substitute for competition." *Id.* at 352 n.8. With regulation, public utilities are precluded from extracting monopoly premiums for their vital services.

Carteret-Craven Electric is not a typical utility, however, but rather an electric cooperative organized under Chapter 117 of North Carolina's General Statutes, which authorizes the creation and operation of "electric membership corporations" — corporations owned and oper-

ated by their members. North Carolina law authorizes such corporations to be formed by persons residing in communities "not served, or inadequately served, with electric energy" and to operate "for the purpose of promoting and encouraging the fullest possible use of electric energy in the rural section of the State by making electric energy available to inhabitants of the State at the lowest cost consistent with sound economy and prudent management of the business of such corporations." N.C. Gen. Stat. §§ 117-8, 117-10. They are nonprofit corporations created, operated, and owned by their members who are the persons using the energy supplied by the corporation. *See id.* § 117-16. The members elect a board of directors who in turn elect a president and a secretary to operate the corporation. Accordingly, the customers of electric cooperatives in North Carolina ultimately have the power to determine the rates that they themselves pay for electric energy. Likewise, they have the authority to decide whether to lease excess space on their utility poles and the rate at which they charge for that space. *See id.* §§ 117-18(9), 117-20.

Even though the members of electric cooperatives have the ultimate power over rates, statutes nonetheless prohibit electric cooperatives from charging other than reasonable and uniform rates for service. *See id.* §§ 117-16, 117-16.1. But even as statutes require that electric service be provided at reasonable and uniform rates, no statute imposes any restriction on the amount that an electric cooperative may charge "[t]o sell, lease, mortgage or otherwise encumber or dispose of all or any part of its property." *Id.* § 117-18(9). More particularly, no statute imposes a restriction on whether an electric cooperative can lease excess pole space or establishes the rate that it can charge for that space. The only relevant statutory provision simply authorizes the cooperative to sell or lease its property as "necessary or convenient for carrying out the purpose for which it was formed." *Id.* § 117-18.

At the federal level, Congress has enacted the Pole Attachment Act of 1978 to regulate the rates that utilities can charge for pole attachments. *See* 47 U.S.C. § 224(b)(1). The Act, however, specifically exempts "any person who is cooperatively organized." *See id.* § 224(a)(1). Indeed, the Act was enacted specifically for the purpose sought to be attained by Time Warner in this case — to regulate the pole-attachment agreements of public utilities, which are "unquestion-

ably in a position to extract monopoly rents from cable [television] systems in the form of unreasonably high pole attachment rates." S. Rep. No. 95-580, at 13 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 109, 121 (internal citations omitted). But Congress recognized that member-owned cooperatives do not present the same danger. As the Senate Report explained:

> Cooperatively owned utilities, by and large, are located in rural areas where often over-the-air television service is poor. Thus the customers of these utilities have an added incentive to foster the growth of cable television in their areas.

*Id.* at 18, *as reprinted in* 1978 U.S.C.C.A.N. 109, 126. Moreover, cooperatively owned utilities have a built-in check against abuses "[b]ecause the pole rates charged by municipally owned and cooperative utilities are already subject to a decisionmaking process based upon constituent needs and interests." *Id.*

Thus, no federal statute regulates electric cooperatives, and, unless the provision of excess pole space to the public is a "service" that is thought to be provided to customers by electric cooperatives, no North Carolina statutory regulation applies to regulate pole-attachment rates charged by electric cooperatives in North Carolina.

Time Warner initially contended in this case that providing excess pole space was a "service," as regulated by §§ 117-16 and 117-16.1 of the North Carolina General Statutes. The district court, however, dismissed that claim as failing to state a cause of action, concluding:

> [H]aving considered the statute, the Commission's lack of regulatory activity, and cases from other states, the court concludes that section 117-16 and section 117-16.1 do not provide authority for this court to conclude that defendant may assess only a reasonable and non-discriminatory pole-attachment rate. Relatedly, the court concludes that defendant's entering into a license agreement with a cable company to provide space on its poles does not constitute a "service" or "services" as defined in Chapter 117.

Time Warner does not challenge this conclusion on appeal. Rather, it limits its contention to the claim that even though no statute regulates pole-attachment rates that may be charged by electric cooperatives in North Carolina, the common law of North Carolina does.

Before the district court, Time Warner relied principally on the case of *Salisbury & Spencer Railway Co. v. Southern Power Co.* ("*Salisbury I*"), 101 S.E. 593 (N.C. 1919). It argued that under *Salisbury I*, public utilities have a common law duty to charge reasonable and nondiscriminatory rates "for use of their property" used in providing their service. In essence, it argued that the common law regulation of a public utility's *service* rates includes the regulation of rates charged for use of its *property* used to provide that service. The district court, however, rejected this argument, concluding:

> This court has not located any case interpreting North Carolina law to extend the common law prohibition against discriminatory rates to include negotiated prices for business agreements that are unrelated to the basic statutory purpose of an entity such as [Carteret-Craven Electric]. Likewise, this court has not located any case applying North Carolina common law to regulate pole-attachment agreements in any manner whatsoever. . . . While appreciative of plaintiff's invitation to be the first, this court will not undertake such an expansion of North Carolina's public policy.

On appeal, Time Warner contends that the district court erred in adopting so limited a view of the "services" of an electric cooperative that are subject to the common law requirements of reasonableness and nondiscrimination. Arguing that the district court holding was "an inappropriately crabbed view of the common law duty" owed of utilities, Time Warner asserts that because utility poles are facilities devoted to the public use by extending electric lines to customers, the utility has a duty to license pole attachments to customers at reasonable and nondiscriminatory rates.

Because of the importance of the services provided by utility companies and their status as natural monopolies, both before and even after the extensive statutory regulation of utilities came about, a body of common law developed under which natural monopolies, such as

electric companies, were required to deal in a reasonable and nondiscriminatory manner when selling their service to their customers. This is true under the common law of North Carolina, as elsewhere. Time Warner argues that because an electric utility monopoly includes the right to place and own utility poles, the common law must also impose a duty of reasonableness and nondiscrimination with respect to leasing access to those poles. To make this argument, it relies principally on *Salisbury I*, 101 S.E. 593.

In *Salisbury I*, the defendant was a public utility corporation subject to the laws governing public utilities in North Carolina. *See* 101 S.E. at 598. The utility sold electric power to the plaintiff, another public utility, which in turn resold the power to consumers. *Id.* The defendant public utility corporation, however, charged its own subsidiary far less for power than it charged the plaintiff and other customers. *Id.* Rejecting the defendant public utility's argument that it had a right to discriminate among consumers, the Supreme Court of North Carolina held that "[i]t is well settled that the common-law obligation of equal and undiscriminating service clearly requires the same charges shall be made to all consumers for the rendering of similar service." *Id.* at 599.

This holding, however, does not advance Time Warner's argument for an extension of the common law duty. The North Carolina court found a duty of reasonableness and nondiscrimination to apply to the defendant utility's electric energy sales, the very service that was the basis for the defendant to be subject to regulation as a public utility. Explaining the need for nondiscrimination in the sale of electric energy, the North Carolina court stated that such discrimination "would leave Salisbury and Spencer [two towns served by the plaintiff's resale of electricity] without lights for the homes and places of business of its people and without power for the operation of their industrial plants or any means of operating the street railway." 101 S.E. at 595.

In contrast to *Salisbury I*, the case before us does not involve the utility function that Carteret-Craven Electric was formed to provide. Carteret-Craven Electric's public responsibility extends to "promoting and encouraging the fullest possible use of *electric energy* in the rural section of the State." N.C. Gen. Stat. § 117-10 (emphasis added).

Although cable services have grown to become important also, Carteret-Craven Electric was not created to provide such service. Moreover, Carteret-Craven Electric was not created to sell, lease, or dispose of its property. While it has those rights, they were given as ancillary to Carteret-Craven Electric's business of providing electric energy to its customers.

All of the other North Carolina cases on which Time Warner relies likewise apply the duties of reasonableness and nondiscrimination only to rates charged to customers *for the specific services the utility was created to provide*. For example, in *In re Lower Cape Fear Water & Sewer Authority*, 407 S.E.2d 155 (N.C. 1991), the North Carolina Supreme Court noted that the local water and sewer authority, a utility organized for the purpose of supplying water, even though not subject to the statute governing public utilities, was nonetheless "subject to the common law rule that it cannot charge rates that would constitute an unwarranted discrimination *among the parties it was formed to serve*." 407 S.E.2d at 157 (emphasis added).

And in *Griffin v. Goldsboro Water Co.*, 30 S.E. 319 (N.C. 1898), the North Carolina Supreme Court found that a water utility was "from the very nature of its functions . . . affected with a public use." 30 S.E. at 319 (internal quotation marks omitted). The court held that in the absence of legislation, the judiciary could protect the public against the exaction of oppressive and unreasonable rates. Yet, the court's holding made clear that the enunciated duty applied only to water, the commodity which the defendant was organized to provide.

Finally, in *Salisbury & Spencer Railway Co. v. Southern Power Co.* ("*Salisbury II*"), 105 S.E. 28 (N.C. 1920), the North Carolina Supreme Court exercised judicial authority to prevent discriminatory rates, stating that under the common law the court "possesses ample power to prevent discrimination in rates by all public service companies, and it cannot be doubted that mandamus will lie to compel the [utility] to furnish its service to the consuming public without discrimination." 105 S.E. at 29. Again, however, the case concerned the sale of the particular service that the utility was created to provide.

These cases are typical of North Carolina's cases, and all of the other cases cited by Time Warner for the proposition that utilities are

subject to a duty of reasonableness and nondiscrimination similarly concern regulation of the particular function the utility was created to provide.*

Even though Time Warner recognizes that these cases deal with the specific service that the given utility was created to provide, it urges that we interpret the common law duty of a public utility more expansively by broadening the definition or scope of the utility's "service" to include the provision of excess pole space to customers. To justify this approach, Time Warner cites *State ex rel. Utilities Commission v. Southern Bell Telephone & Telegraph Co.*, 299 S.E.2d 763 (N.C. 1983), for the proposition that a public utility's duty of reasonableness and nondiscrimination extends to ancillary activities.

In *Southern Bell*, the North Carolina Supreme Court addressed whether revenues from the printing of the "yellow pages" could be included as part of the "public utility function" and therefore as part of the rate structure of the telephone utility. Rejecting Southern Bell's

---

*See *N.C. Pub. Serv. Co. v. Southern Power Co.*, 282 F. 837, 841-42 (4th Cir. 1922) (relying on the implication of duties to the defendant power company regarding nondiscrimination "in consideration of the service to the public expected of it in the exercise of the charter powers granted," namely, "furnishing electricity"); *Dale v. City of Morganton*, 155 S.E. 2d 136, 141 (N.C. 1967) (requiring an electric company to furnish electricity to a property on a nondiscriminatory basis); *Pee Dee Elec. Membership Corp. v. Carolina Power & Light Co.*, 117 S.E. 2d 764, 769-70 (N.C. 1961) (noting a "duty of a court in equity to fill in the vacuum" created by an absence of a specific statute with respect to the plaintiff electric cooperative's distribution of electric energy (internal quotation marks omitted)); *Halifax Paper Co. v. Roanoke Rapids Sanitary Dist.*, 61 S.E.2d 378, 380 (N.C. 1950) (concerning the provision of water to customers by an entity formed for such purpose); *Walls v. Strickland*, 93 S.E. 857, 857 (N.C. 1917) (concerning the provision of telephone service by a telephone company); *Clinton-Dunn Tel. Co. v. Carolina Tel. & Tel. Co.*, 74 S.E. 636, 637 (N.C. 1912) (concerning a telephone service dispute between two telephone companies arising out of the disconnection of telephone customers in one locale from the defendant's systems); *Godwin v. Carolina Tel. & Tel. Co.*, 48 S.E. 636, 636 (N.C. 1904) (recognizing a generic requirement that a telephone company provide telephone service to all on a nondiscriminatory basis).

argument that the publication and distribution of yellow pages was not part of the utility's services, the North Carolina Supreme Court stated:

> Although Southern Bell is technically correct in its contention that actual transmission of messages across telephone lines is not dependent on the existence of the yellow pages, such an interpretation of the public utility function is far too narrow. Southern Bell's utility function is to provide adequate service to its subscribers. To suggest that the mere transmission of messages across telephone lines is adequate telephone service is ludicrous.

299 S.E.2d at 765. In short, the court held that the provision of the yellow pages was part of the main function that the telephone utility was created to perform — providing telephone service to its customers — and that adequate telephone service could not be provided without a telephone directory. But that holding is not analogous to what Time Warner would have us do. In the case before us, the *leasing* of excess pole space to a cable company is not even arguably necessary to or part of the public utility's function of providing electric energy to its customers. At most, it supports Carteret-Craven Electric's efforts to raise money from sources collateral to the provision of electrical service.

In sum, Time Warner cites no case holding that under the common law, a utility's property, such as excess space on utility poles, must be made available to the utility's customers and that utilities must lease that excess utility space at reasonable and nondiscriminatory rates. Surely any common law principle that would require a utility to lease its property, such as its excess utility pole space, to its electrical service customers who are cable service providers would also require that the utility lease its excess pole space to other customers who might, for example, wish to advertise on them. The principle might, indeed, have to apply to excess office space because offices are property of the utility used in providing electric service to customers. No case, however, expands the concept of a utility's "service" to include a requirement to lease to its customers its facilities that it built to provide its service to customers.

Time Warner places much emphasis on the fact that it also is a public utility that needs access to the essential resources of Carteret-Craven Electric's utility poles. But the fact that an electric utility has the only poles in a geographical area does not, under North Carolina common law, require it to lease excess space on those poles to others. Its business is not pole leasing; its business is to provide electric service. Indeed, it was just the problem identified by Time Warner — the obvious inefficiency in distributing electric service and cable to the same community by means of separate facilities — that prompted Congress to pass the Pole Attachment Act and the 1996 amendments to it, as contained in the Telecommunications Act of 1996. *See* 47 U.S.C.A. § 224(f) (West 2001). The fact that enactment of such regulation was thought to be necessary, however, is telling about the existence of pole-attachment regulation before the federal statutes. Absent the federal statutes, there was no common law requirement that utilities lease their poles at reasonable and nondiscriminatory rates or that they even make their poles available for pole attachment at all. In order to establish these duties, Congress needed to enact the Pole Attachment Act and the later amendments to it. And of course, as already noted, these statutes specifically exempt electric cooperatives.

If Time Warner had wished to address the problem through allegations that Carteret-Craven Electric misused its monopoly power, it would have had to rely on the substantially different legal principles provided by applicable antitrust law. In this case, however, Time Warner did not charge Carteret-Craven Electric with any antitrust violation. It contended only that under *North Carolina common law contract principles*, a public utility must charge reasonable and nondiscriminatory rates for its services, including the leasing of its property. It says that because it is a "customer" of Carteret-Craven Electric *for electrical service*, it is entitled to lease Carteret-Craven Electric's *excess pole space* at reasonable and nondiscriminatory rates. Yet no case has so held.

III

Even as Time Warner argues that "[t]he only thing unique about this case is the application of these well-established principles to the particular facts at hand," it acknowledges that the district court believed that applying North Carolina's common law to the facts at

hand "would lead it into waters unchartered by North Carolina courts." It contends, however, that the district court's observation misconstrues its responsibility as a federal court sitting with diversity jurisdiction. As Time Warner argues:

> The precedents of this Court make clear that it is the duty of the United States District Courts, sitting in diversity juris- diction, to anticipate how the highest court in the state would rule on an open question of state law.

*See, e.g.*, *Private Mortgage Invest. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002); *Wells v. Liddy*, 186 F.3d 505, 527-28 (4th Cir. 1999). And it maintains that we can readily anticipate that North Carolina would apply the common law princi- ples regulating public utilities to pole leasing, based on existing pre- cedent. We do not agree, however. There are several indications that argue powerfully for leaving this question open for development by the North Carolina legislature or the North Carolina Supreme Court.

*First*, because an electric cooperative's leasing of excess pole space is distinct from its provision of electric services to customers, in the absence of a North Carolina case, we are not persuaded by logic that North Carolina courts would subject pole-attachment agreements to the same degree of judicial regulation as they require with respect to rates for electrical services. As the district court found persuasive with respect to electric cooperatives, the governing statute draws a distinction between "render[ing] [electrical] service" — the purpose for which Carteret-Craven Electric was created — and "leas[ing] . . . any part of its property" — an ancillary right which would include any pole-attachment agreement. *See* N.C. Gen. Stat. §§ 117-16, 117-18(9).

*Second*, neither Congress nor the North Carolina legislature has elected to regulate pole-attachment agreements for electric coopera- tives, although they have had the opportunity to do so. Congress explicitly exempted cooperatively organized entities such as Carteret- Craven Electric from regulation under the Federal Pole Attachment Act. *See* 47 U.S.C.A. § 224(a)(1) (West 2001) ("The term 'utility' . . . does not include . . . any person who is cooperatively organized . . ."). Similarly, the North Carolina legislature has made no attempt to regu-

late pole-attachment agreements for electric cooperatives. Time Warner implicitly admits as much in arguing that the North Carolina Utilities Commission does not have jurisdiction over pole-attachment agreements. If Congress and the North Carolina legislature have elected not to regulate pole-attachment agreements for electric cooperatives, it is not the place of a federal court sitting in diversity to jump in and do so as a predicted extension of state common law.

*Third*, the policy for not statutorily regulating pole-attachment agreements involving electric cooperatives also applies to any consideration of creating a common law duty. The policy behind legislative inaction is the fact that cooperatively organized utilities are uniquely qualified to regulate pole attachments for themselves. As Congress noted, cooperatives have a built-in check against abuses "because the pole rates charged by . . . cooperative utilities are already subject to a decisionmaking process based upon constituent needs and interests." S. Rep. No. 95-580, at 18, *as reprinted in* 1978 U.S.C.C.A.N. 109, 126. As owners and voting members of the cooperative, the electric utility customers control the actions of the corporation that would facilitate or restrict their receipt of cable service.

*Fourth*, North Carolina courts have been traditionally reluctant to tread on what are regarded as legislative prerogatives. Thus, in a case concerning the scope of service to be offered by an electric membership corporation, the North Carolina Supreme Court held that "[c]ourts have no right to usurp legislative power and by judicial decrees formulate a public policy not declared by the Legislature." *Duke Power Co. v. Blue Ridge Elec. Membership Corp.*, 122 S.E.2d 782, 784 (N.C. 1961).

*Fifth*, sitting in diversity, a federal court "should not create or expand [a] State's public policy." *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995). Moreover, "[a]bsent a strong countervailing federal interest, the federal court . . . should not elbow its way into this controversy to render what may be an uncertain and ephemeral interpretation of state law." *Mitcheson v. Harris*, 955 F.2d 235, 238 (4th Cir. 1992)(internal quotation marks omitted). Time Warner has proffered no cases interpreting North Carolina law to extend the common law prohibition against unreasonable and discriminatory rates to include negotiated prices for agreements that are

unrelated to the basic statutory provision of services for which the entity was created, and we have found none. Indeed, Time Warner acknowledged to the district court that it too had been unable to find any state or federal case that had relied on the common law to regulate pole-attachment agreements.

We conclude accordingly that as a court sitting in diversity, we should not create or extend the North Carolina common law as requested by Time Warner.

IV

We appreciate, with genuine sympathy to Time Warner's argument, the efficiency that Time Warner seeks to effect by using existing electric utility poles for the distribution of its cable service. Indeed, this efficiency is precisely the reason for Congress' enactment of the Pole Attachment Act. But Congress specifically excluded cooperatives. The proposed pole-attachment agreement between Time Warner and Carteret-Craven Electric must, we conclude, be reached through private negotiation, if at all. And if any regulation or compulsion is to be applied to pole-attachment agreements, it should be done by the North Carolina legislature, the North Carolina Utilities Commission, the North Carolina state courts, or indeed, Time Warner's fellow cooperative members, but not by us.

The judgment of the district court is

*AFFIRMED*.