# IN THE SUPREME COURT OF TEXAS

══════════
No. 17-0840
══════════

TIME WARNER CABLE TEXAS LLC AND
PUBLIC UTILITY COMMISSION OF TEXAS, PETITIONERS,

v.

CPS ENERGY AND SOUTHWESTERN BELL TELEPHONE COMPANY
D/B/A AT&T TEXAS, RESPONDENTS

══════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
══════════════════════════════════════════

**Argued January 24, 2019**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

JUSTICE BUSBY did not participate in the decision.

Under the Public Utility Regulatory Act ("PURA"), "a municipality or municipally owned utility may not discriminate in favor of or against a certificated telecommunications provider regarding . . . utility pole attachment . . . rates or terms".[1] In this case, the Public Utilities Commission ("PUC") concluded that a utility that invoices different providers a uniform rate nevertheless violates this provision if it "fail[s] to take timely action to ensure that all pole attachers

---

[1] TEX. UTIL. CODE § 54.204(b) ("In granting consent, a franchise, or a permit for the use of a public street, alley, or right-of-way within its municipal boundaries, a municipality or municipally owned utility may not discriminate in favor of or against a certificated telecommunications provider regarding: (1) municipal utility pole attachment or underground conduit rates or terms . . . ."). All statutory references are to PURA unless otherwise noted.

actually [pay] the uniform rate it invoice[s]."[2] We agree, and accordingly reverse the judgment of the court of appeals in part and remand the case to the trial court.[3]

CPS Energy, a utility owned by the City of San Antonio, supplies electricity to customers over lines attached to poles that it owns on its rights-of-way in the San Antonio area. Telecommunication providers lease space on the poles to attach their wires and cables. Providers Time Warner Cable ("Time Warner") and Southwestern Bell Telephone Company d/b/a AT&T Texas ("AT&T") constructed their networks in San Antonio using CPS Energy's poles under different agreements. Time Warner's 1984 agreement provided for an initial annual pole attachment rate of $3.75 per pole, with an escalator clause allowing annual rate increases. Time Warner also agreed to pay a permit application fee each time it attached to one of CPS Energy's poles. AT&T's 1987 agreement set a fixed annual pole attachment rate of $3.75 per pole with no escalator clause. AT&T was not required to pay permit application fees.

By January 2007, Time Warner's pole attachment rate had escalated from $3.75 to $15.63. CPS Energy billed AT&T the higher rate, but AT&T continued to pay the lower amount, and CPS Energy did nothing to collect its invoices until January 2009. PURA Section 54.204(c) has, since September 1, 2006, required utilities like CPS Energy to "charge" all telecommunications providers

---

[2] Tex. Pub. Util. Comm'n, *Petition of CPS Energy for Enforcement Against AT&T Texas and Time Warner Cable Regarding Pole Attachments*, Docket No. 3663, at 17–18 (Feb. 1, 2013) (order on rehearing) [hereinafter PUC Order].

[3] 537 S.W.3d 157.

"a single, uniform pole attachment . . . rate",[4] and Section 54.204(b) prohibits CPS Energy from "discriminat[ing]" between providers "regarding . . . utility pole attachment . . . rates or terms".[5] In December 2008, Time Warner sued CPS Energy for violating these provisions by not requiring AT&T to pay the higher rate and began paying CPS Energy the lower amount. A month later, CPS Energy petitioned the PUC to enforce Section 54.204 against AT&T and Time Warner—specifically, to order them to pay outstanding pole attachment fees from 2008 forward. On CPS Energy's motion, the trial court abated Time Warner's lawsuit pending completion of the administrative proceedings.

In its final order, the PUC concluded that by failing to take "meaningful", "serious", and "timely action to ensure that all pole attachers actually paid the uniform rate it invoiced", CPS Energy violated both Section 54.204(c)'s uniform-charge requirement and Section 54.204(b)'s

---

[4] § 54.204(c) ("[N]ot later than September 1, 2006, a municipality or municipally owned utility shall charge a single, uniform pole attachment or underground conduit rate to all entities that are not affiliated with the municipality or municipally owned utility regardless of the services carried over the networks attached to the poles or underground conduit.").

[5] § 54.204(b)(1).

3

prohibition of discrimination.[6] The PUC ordered CPS Energy to comply with Section 54.204 going forward.[7] The district court affirmed these conclusions.[8]

The court of appeals reversed, reasoning as follows. Section 54.204(c) requires only that a utility *charge* uniform rates, not that it also *collect* them.[9] Although neither word is defined in PURA, the ordinary, dictionary definitions show that the two terms are different, and PURA itself distinguishes them.[10] For example, PURA defines *rate* to include "a compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, *or collected*".[11] The purpose of the uniform-rate requirement is to help ensure that a utility does not discriminate in allowing telecommunications providers to attach cables to its poles.[12] If a telecommunications provider does not pay the rate the utility uniformly charges, any discriminatory

---

[6] PUC Order, *supra* note 2, at 1–2 ("find[ing] that CPS Energy . . . made no meaningful effort to collect a uniform rate" "for the period following December 31, 2006" and therefore "violated PURA § 54.204(c)"); *id.* at 17–18 ("The Commission concludes that CPS Energy did not charge a uniform rate given its failure to take timely action to ensure that all pole attachers actually paid the uniform rate it invoiced."); *id.* at 43 (concluding that "CPS Energy did not comply with non-discrimination provisions of PURA § 54.204(b) because the rates and terms offered to TWC and AT&T were not the same"); *id.* at 44 (concluding that because CPS Energy "made no serious effort to collect a uniform rate" after December 31, 2006, it "violated the uniform rate requirement of PURA § 54.204(c)").

[7] *Id.* at 46.

[8] This case took almost four years to complete at the Commission level, involving over 800 filings, close to 60 orders, and several certified questions. The PUC made many other conclusions, some of which the district court reversed. Only the Section 54.204(b) and (c) conclusions are at issue here.

[9] 537 S.W.3d 157, 189–190.

[10] *Id.* at 190 & n.17.

[11] § 31.002(15) (emphasis added), *quoted in* 537 S.W.3d at 190 n.17.

[12] 537 S.W.3d at 190.

effect is the telecommunication provider's fault, not the utility's.[13] A utility that "enter[s] into side agreements with certain attaching entities for a different rate or who ma[kes] *no* effort to collect from an attaching entity who was not paying the charged rate" might violate Section 54.204(c), but there is no evidence of collusive or fraudulent conduct by CPS Energy here.[14] For the same reasons that CPS Energy's ineffective collection efforts did not violate Section 54.204(c), CPS Energy also did not violate Section 54.204(b).[15] Thus, the court concluded, the PUC exceeded its authority in requiring CPS Energy to use meaningful and serious efforts to collect its rates.[16] We granted the PUC's and Time Warner's petitions for review.[17]

Utility poles support overhead public utilities, and wire-based telecommunications providers like Time Warner pay rental fees to attach equipment to these poles. In effect, pole access determines whether telecommunications providers can enter a community. Telecommunications providers have no cost-effective alternative but to pay pole owners' stated rental fees to construct a network of wires and cables that will be insulated from people and vehicles. This disparity in

---

[13] *See id.* at 191.

[14] *Id.*

[15] *Id.* at 197.

[16] *Id.* at 191. CPS Energy raised five issues in the court of appeals, including challenges to the methods that the PUC used to determine the calculation of pole attachment rates and its authority to review and modify inputs CPS Energy used to make these calculations. Only the court of appeals' holdings on Section 54.204(b) and (c) are at issue here.

[17] 62 Tex. Sup. Ct. J. 119–120 (Nov. 16, 2018).

bargaining power has resulted in a host of abuses, including telecommunications providers charging discriminatory and exorbitant rents to attach equipment to poles.[18]

In 1978, Congress responded with the Pole Attachment Act, which requires the Federal Communications Commission, in the absence of state regulation, to "regulate the rates, terms, and conditions for pole attachments" and ensure that they are "just and reasonable".[19] The federal act set the stage for a wave of state regulation. Recognizing that "public utilities are by definition monopolies in the areas they serve", Texas first passed the Public Utility Regulatory Act in 1975 to "protect the public interest in [utilities'] rates and services".[20] The Legislature has amended PURA several times since. A nondiscrimination provision was added in 1995[21] and moved to Section

---

[18] *See Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 330 (2002) ("Since the inception of cable television, cable companies have sought the means to run a wire into the home of each subscriber. They have found it convenient, and often essential, to lease space for their cables on telephone and electric utility poles. Utilities, in turn, have found it convenient to charge monopoly rents."); *Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 309 (4th Cir. 2007) ("[P]ublic utilities[] . . . are 'unquestionably in a position to extract monopoly rents from cable [television] systems in the form of unreasonably high pole attachment rates.'" (second alteration in original) (quoting S. REP. NO. 95-580, at 13 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 109, 121)); *Georgia Power Co. v. Teleport Commc'ns Atlanta, Inc.*, 346 F.3d 1033, 1036 (11th Cir. 2003) ("[C]able companies have always attached their cables to utility poles of power and telephone companies in order to take advantage of the pre-existing network of poles, conduits, and rights-of-way. The lack of alternatives to these existing poles allowed utilities to charge cable companies monopoly rents for their attachments.").

[19] Pole Attachment Act, 47 U.S.C. § 224(b)(1) (Feb. 8, 1996); *see Gulf Power Co.*, 534 U.S. at 330–331.

[20] Public Utility Regulatory Act, 64th Leg., R.S., ch. 721, § 2, 1975 Tex. Gen. Laws 2327, 2327 ("This Act is enacted to protect the public interest inherent in the rates and services of public utilities. The legislature finds that public utilities are by definition monopolies in the areas they serve; that therefore the normal forces of competition which operate to regulate prices in a free enterprise society do not operate . . . . The purpose of this Act is to establish a comprehensive regulatory system which is adequate to the task of regulating public utilities as defined by this Act, to assure rates, operations, and services which are just and reasonable to the consumers and to the utilities.") (amended multiple times) (current version at TEX. UTIL. CODE § 31.001(a)–(b)).

[21] Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 29, sec. 3.2555, 1995 Tex. Gen. Laws 2017, 2037.

6

54.204 during the 1997 recodification of PURA in the Utilities Code.[22] The 2005 amendments added the uniform-charge requirement in Section 54.204(c).[23]

Petitioners argue that despite differences in the meanings of charge and collect, charging rates necessarily entails making reasonable efforts to collect them, especially in Section 54.204, which prohibits discrimination in effect as well as by intent. We need not address this argument. PURA treats the two terms separately in defining *rate*, as the court of appeals noted.[24] But PURA's definition of rate includes both charge and collect.[25] Substituting the definition of rate for that word in Section 54.204(b)'s prohibition of "discriminat[ion] . . . regarding . . . rates"[26] yields a prohibition applicable to "compensation . . . charged[] *or* collected".[27] CPS Energy failed to make any serious or meaningful effort to collect from AT&T before it initiated the enforcement proceeding, and it collected far more from Time Warner than from AT&T. CPS Energy discriminated in collecting rates from these telecommunications providers and, because its actions fall within Section 54.204(b)'s prohibition, we need not address what conduct is included in charging rates.

Read as a whole, PURA prohibits discrimination. There is no dispute that while CPS Energy charged Time Warner and AT&T the same rates, it collected far more from Time Warner. The

---

[22] Act of May 21, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 829.

[23] Act of August 10, 2005, 79th Leg., 2d C.S., ch. 2, § 6, 2005 Tex. Gen. Laws 4, 8–9.

[24] 537 S.W.3d 157, 190 & n.17.

[25] § 31.002(15).

[26] § 54.204(b)(1).

[27] § 31.002(15) (emphasis added).

PUC's finding that CPS Energy failed to make any serious or meaningful effort to collect from AT&T before it initiated the enforcement proceeding is supported by substantial evidence, and the effect on Time Warner was clearly discriminatory. Thus, the PUC could reasonably have concluded, as it did, that CPS Energy violated the plain terms of Section 54.204(b), and we need not consider whether the same conduct also violated Section 54.204(c).[28]

Accordingly, we reverse the court of appeals' judgment in part and remand the case to the trial court.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: May 17, 2019

---

[28] CPS Energy argues that Section 54.204 does not apply to Time Warner because it does not apply to "community antenna television services", § 51.003(4), and does not mention cable service providers. CPS Energy did not make this argument in the trial court or the court of appeals and therefore cannot raise it in this Court for the first time.